**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James H. SPIKES (96–3899); Marilyn
Smith (96–3660), Defendants–
Appellants.**

Nos. 96–3660, 96–3899.

United States Court of Appeals,
Sixth Circuit.

Argued April 22, 1998.
Decided Sept. 2, 1998.

David A. Sierleja (argued and briefed), office of the U.S. Attorney, Cleveland, OH, for United States.

Terry H. Gilbert (argued and briefed), Friedman & Gilbert, Cleveland, OH, for Spikes.

Wesley A. Dumas, Sr. (argued and briefed), Wesley A. Dumas, Sr. & Associates, Cleveland, OH, for Smith.

Before: GUY, GILMAN, and GODBOLD,* Circuit Judges.

GILMAN, Circuit Judge.

James H. Spikes and Marilyn Smith, who lived together in Spikes's residence along with their five children, were arrested by the police following a search of the residence in August of 1995. In a two-count indictment, the government charged Spikes and Smith

---

* The Honorable John C. Godbold, Circuit Judge of the United States Court of Appeals for the Elev- enth Circuit, sitting by designation.

with possessing crack cocaine with the intent to distribute, and charged Spikes with being a felon in possession of a firearm.

After the district court denied a motion to suppress the evidence seized at the residence, Smith entered a conditional guilty plea to possessing crack cocaine with the intent to distribute. Spikes, however, maintained that he had no knowledge of the drugs found in his home. Instead, he claimed that Smith was the only one involved in any criminal activities that may have taken place there. After a two-day jury trial, Spikes was convicted on both counts in the indictment. Smith was sentenced to 121 months in prison. Spikes, because of his two prior drug convictions, was given a sentence of life imprisonment. On appeal, Spikes and Smith recite a litany of alleged errors committed by the district court.

They both assert that the district court improperly denied their motion to suppress. Specifically, they contend that the information presented in support of the search warrant for the residence had grown stale by the time the police applied for the warrant. They also argue that the police violated the "knock and announce" rule during their execution of the warrant by not waiting long enough after announcing their presence before entering.

Spikes further claims that the jury's verdict was tainted with unfair prejudice. In particular, Spikes maintains that the testimony of Jeanette Limoli was improper under Rule 404(b) of the Federal Rules of Evidence. He also claims that the district court erred in admitting into evidence certain inculpatory statements he made to the police following his arrest. As a final matter, Spikes protests his prison sentence, claiming that his two prior drug convictions were not "felony drug offenses" within the meaning of 21 U.S.C. § 841(b)(1).

For the reasons set forth below, we **AF-FIRM** the judgment of the district court denying the defendants' motion to suppress and **AFFIRM** Spikes's conviction and sentence.

## I. BACKGROUND

### A. The Investigation

Law enforcement's investigation into Spikes's drug-trafficking activities began with his arrest in 1992 for the sale of crack cocaine on two separate occasions in November of 1991. When arrested, Spikes was found in possession of a small quantity of crack cocaine. Spikes was charged with two counts of attempted aggravated trafficking in drugs under OHIO REV.CODE. ANN. § 2923.02(A) (Anderson 1997), and one count of felony drug abuse under OHIO REV.CODE ANN. § 2925.11(C)(4)(b) (Anderson 1997). Spikes later pled guilty to one count of attempted aggravated drug trafficking and to the count of felony drug abuse, serving a little more than a year and a half in prison before being released in early 1994.

On August 11, 1995, Special Agent Scott Smith appeared before a judge to present an affidavit in support of a warrant to search Spikes's residence. The affidavit narrated in great detail law enforcement's investigation of Spikes since his release from prison and contained the following information concerning his drug-trafficking operation:

By May of 1995, most of Spikes's drug "outlets," i.e., crack houses, had been closed down by the authorities. Spikes in turn moved the bulk of his drug-trafficking operations to his residence located at 505 North State Street in Painesville, Ohio. This fact was confirmed by a confidential informant in June of 1995. The informant told authorities that 505 North State Street had become the primary source of crack cocaine in town. Spikes would receive regular shipments of powder cocaine from one of his "connections" in Cleveland. The powder cocaine would then be "cooked" by Spikes at 505 North State Street through the use of razor blades, glass beakers, test tubes, and baking soda. From this crude laboratory process, Spikes was able to manufacture between fifteen and fifty packs of crack cocaine from each batch. Spikes's associates would later distribute the crack cocaine and remit to Spikes the profits generated from their sales of the substance. The informant also alerted authorities that he had seen as much as $15,000 in cash in the

upstairs bedroom and that Spikes had access to firearms that were stored in the house.

Later in July of 1995, authorities learned that a great deal of drug trafficking was taking place at 505 North State Street. As evidence of this fact, the police observed a steady stream of "workers" equipped with pagers proceeding from the house to a nearby bar to deliver crack cocaine to buyers. On August 1, 1995, agents searched the trash from 505 North State Street and uncovered nine razor blades with cocaine residue, a broken test tube with cocaine residue, one 100–ml. beaker, a 500–ml. flask, and an empty one-pound box of baking soda.. In addition, agents uncovered an assortment of plastic bags with cocaine residue and a brown paper bag with a series of numbers written on the outside. The agents later testified that such evidence is consistent with an ongoing drug-trafficking operation.

## B. The Search of Spikes's Residence

After reviewing Special Agent Smith's affidavit, a Lake County Court of Common Pleas judge issued the warrant. SWAT team members and agents from the Lake County Narcotics Agency ("LCNA") then held a warrant briefing. During this briefing, agents were informed that the residence at 505 North State Street is a two-story house with a basement, front porch, and an unattached garage. The front door to the house, accessed from the porch, is composed of an exterior aluminum storm door and an interior wooden door. The agents were told that, in addition to the possible presence of guns and drugs in the house, Spikes might have access to police scanning equipment and lookouts as an early warning system for detecting police activity. The agents were also warned that Spikes might have armed security guards living in the unattached garage. At the conclusion of the briefing, the SWAT team, along with LCNA agents, traveled to 505 North State Street to execute the warrant.

At approximately 10:00 A.M. on August 11, 1995, a marked police van pulled up in front of 505 North State Street. Other marked police units were meanwhile strategically placed along the perimeter of the residence.

As nine SWAT team members stormed out of the van's back door, Captain Len Bruno stepped out of the van and announced with a bullhorn: "Sheriff's office, search warrant, sheriff's office, search warrant, come out of the house, open your door." The SWAT team also shouted "Sheriff's office, search warrant, sheriff's office, search warrant, open the door" as they charged the front porch. Prior to the police's entry, neighbors had already exited their homes to observe the execution of the warrant in response to this police activity.

Upon reaching the front porch, the entry team noticed that the front interior wooden door was open, but that the exterior storm door was closed. Detective Keith King, the first SWAT team member to reach the porch, pounded on the storm door. While King pounded on the door, Detective Todd Menmuir shouted "Sheriff's office, search warrant, sheriff's office, search warrant, open the door." At no point did either officer see or hear any movement coming from within the house. After knocking on the door for about four seconds, King checked the door and found it unlocked, at which time he and Menmuir entered the house. The total elapsed time from when Captain Bruno first used the police bullhorn until King and Menmuir entered the house was approximately 15 to 30 seconds.

Upon entering the home, the officers found Smith in the first floor dining room standing next to a table. On the table was a dinner plate holding 80.59 grams of crack cocaine and a box containing plastic baggies, razor blades, and a vast assortment of glassware. A Colt .45 handgun was recovered from behind a picture frame in the dining room. In the kitchen, additional plastic baggies and razor blades were found, all containing crack cocaine residue. The officers also located more than $8,925 in cash stashed in different areas of the house.

The police found Spikes sleeping in the upstairs master bedroom. After being advised of his rights, Spikes told them that he had just gotten home and had spent the last hour watching television. Spikes also told the police that he knew nothing about the drugs they found in the house. Specifically,

he stated: "I don't believe it if you say crack was here. I didn't see crack when I came up here. I wasn't here when the crack came in. I don't touch nothing, cuz I'm on paper. I'm on parole, I don't sell dope. I'm not the one pushing drugs, ask Marilyn." After being interrogated further by police, however, Spikes admitted that he knew there was crack cocaine downstairs. In his own words, he said: "I guess unofficially, there's an ounce down there, off the record. Now if there is an ounce down there, you all going to say I know. You can make around eight hundred dollars an ounce, it depends." The police then arrested Smith and Spikes.

### C. The Trial

A grand jury indicted both Smith and Spikes on one count of possessing crack cocaine with the intent to distribute, a violation of 21 U.S.C. § 841(a)(1). Spikes was also indicted on one count of being a convicted felon in possession of a firearm, a violation of 18 U.S.C. § 922(g). The government later notified Spikes that it intended to seek a mandatory life sentence pursuant to 21 U.S.C. § 841(b)(1)(A) because he had two prior felony drug convictions.

Before trial, Smith and Spikes moved to suppress the evidence seized at their residence. The district court denied the motion to suppress. Based on that denial, Smith entered a conditional guilty plea to possessing crack cocaine with the intent to distribute.

Spikes, in contrast, continued to maintain his innocence. He claimed that he did not know there were any drugs in his house on the morning in question. Instead, he identified Smith as the one involved in any drug activities that may have occurred on the premises. This assertion became Spikes's defense at trial, i.e., that he was not guilty of the drug possession charge because he was unaware there were any drugs in the house and that any drugs found there belonged to Smith.

Shortly after Spikes was indicted, his attorney requested that the government turn over any statements Spikes made to the police following his arrest. By letter dated November 13, 1995, the government respond-

ed that "Mr. Spikes did not ... provide a statement to law enforcement officers following his arrest." Although the government did eventually turn over a copy of the statement Spikes made to police during their search of his home, it was given only on the eve of trial many months later. Because of the statement's late production, the government agreed not to use those portions of the statement where Spikes admitted that he knew there were drugs in the residence. The parties, however, never informed the district court of their agreement nor sought its approval.

On the first day of trial, the government served on defense counsel a notice of its intent to call Jeanette Limoli as a witness. In its notice, the government stated that Limoli would testify that she assisted Spikes in selling crack cocaine from early 1994 until his arrest in August of 1995. Limoli would also "outline the defendant's ability to acquire cocaine and his network to distribute crack including the crack seized on August 11, 1995." As part of her testimony, Limoli was prepared to describe a telephone conversation she had with Spikes on August 10, 1995, during which Spikes admitted that he had purchased the crack cocaine that the police later seized the next day. The government also noted that Limoli would testify to another telephone conversation she had with Spikes the day he was arrested, when he told her that the police would not be able to link him to the drugs because he was sleeping upstairs and because Smith was going to take the fall for the drugs found in the home.

In response, Spikes filed a motion in limine to exclude Limoli's testimony under Rule 404(b) of the Federal Rules of Evidence. During the subsequent hearing, the government noted that Limoli's testimony was designed to show that Spikes knew there were drugs in the house on the morning in question. Defense counsel argued that Limoli's testimony would "dramatic[ally] change the scope of this case" into a conspiracy to distribute crack cocaine.

Without deciding the permissible scope of Limoli's testimony, the district court ruled that her testimony was admissible under

Rule 404(b). The court noted, however, that the testimony would result in "some prejudice," but that "with the assistance of a limiting instruction it [would not] turn out to be unfair prejudice, as long as the scope is narrow which the government explores." After tying up this evidentiary loose end, the trial began.

After opening statements to the jury, the government called Special Agent Smith to the witness stand. During the agent's direct examination, the following exchange took place:

Q: Did you at some point in time have an opportunity to talk with the defendant?

A: Yes, I did.

Q: When?

A: Inside the residence.

. . . .

Q: What did he tell you?

A: Primarily he told me he didn't know anything about any drugs in the house. That he had some money that he stashed in the residence; he did not have an exact dollar amount. He said that he obtained the money while working at the Gateway Cafe and through his own personal business.

On cross-examination, defense counsel highlighted this aspect of the agent's testimony as follows:

Q: And when you saw Mr. Spikes in the room, he clearly denied that these drugs were his; is that correct?

A: Yes.

. . . .

Q: And to the extent of your conversation with Mr. Spikes was that he denied possessing these drugs or having any knowledge of these drugs; is that correct?

A: The extent of my conversation was the fact that he did not know anything about the drugs downstairs . . . .

Q: The fact of the matter is he denied possessing or controlling or knowing about any of those——any drugs that were found in that house; is that correct?

A: Correct.

The government then asked for a sidebar conference. At sidebar the government ar-gued that, by framing the question as "to the extent of your conversation with Mr. Spikes," defense counsel had opened the door for the introduction of the other portions of Spikes's statement to police. The government noted in particular that the answer given by the agent to the question posed by defense counsel left "the impression that that was the only drug-related conversation." Defense counsel countered that, regardless of any false impression conveyed by the agent's answer to his question, the statement was inadmissible under the terms of the parties' informal agreement. Additionally, defense counsel argued that he had relied upon the informal agreement in deciding not to pursue a motion to suppress the statement because of its late production. The district court was not convinced by this argument.

The district court expressed concern with the impression defense counsel's cross-examination of the agent had left with the jury. By using the phrase "to the extent of your conversation with Mr. Spikes," the court noted that any answer provided by the agent would necessarily have to reference the inculpatory portions of the statement. Thus the agent's answer left the jury with the false impression that Spikes did not say anything else concerning the drugs found in the residence. As the district court observed, "I don't know how their 14 ears heard this, but when I heard the responses to the last two questions you posed, [what it] implied strongly was that that was it, there was nothing else that was said about drugs. And that puts the government in a really difficult position." The district court therefore decided that the government could bring to light the remaining portions of the statement to dispel the false impression created by defense counsel's cross-examination.

On redirect, the government elicited the following testimony from Special Agent Smith:

Q: Sir, you recall the last two questions counsel for the defendant asked you?

A: Yes, I do.

. . . .

Q: Try to paraphrase that; you were asked whether the conversation or the ex-

tent of the conversation dealing with the defendant's denial or knowledge of the drugs found on the first floor was complete, that is that your statement was complete when I asked you that question originally, in terms of the dialogue between yourself and the defendant; is that correct?

A: That's what he had asked me.

Q: All right. Was that the extent of your conversation regarding the drugs?

A: No, it was not.

Q: What else did he tell you?

MR. GILBERT: Objection.

THE COURT: You can answer.

A: Mr. Spikes said that, he said, "I guess unofficially there might be an ounce downstairs. Of course off the record," he said. He went on to say, "if now you all are probably going to say I knew it was down there," and then he stated, "You could probably make about $800 an ounce; it depends."

The government then introduced the testimony of Everett Scott, a jailhouse informant. Scott testified that in November of 1995 Spikes admitted that he ran a drug-trafficking operation, that the drugs seized in his residence on August 11 belonged to him, and that Smith would take the rap for the drugs because she stood a better chance of receiving probation.

Jeanette Limoli also testified. She related her knowledge of Spikes's drug-trafficking operations, her involvement in those operations, and the details of her telephone conversations with Spikes. At the conclusion of her testimony, defense counsel renewed his objection to the admission of her testimony. The district court overruled the objection and then gave the following limiting instruction to the jury:

Ladies and gentlemen, you have heard the testimony that Jeanette Limoli knows Mr. Spikes because they were involved in criminal activity together prior to August 11th of 1995.

You may not consider Miss Limoli's testimony of Mr. Spikes' alleged prior criminal activity as evidence of his guilt of the crimes charged in this case. You may

consider this testimony only as it may relate to the circumstances immediately surrounding the events of August 11th, 1995.

The district court later provided the following instruction at the conclusion of the trial:

You have heard testimony that the defendant allegedly committed criminal acts other than the ones charged in the indictment. You cannot consider this testimony as evidence the defendant committed the crimes that he is on trial for now. Instead, you can consider it only as it may relate to the events of August 11th, 1995, including the defendant's opportunity, intent, or knowledge. Remember, the defendant is on trial here for the crimes charged in this case.

After less than a day of deliberations, the jury found Spikes guilty on both counts of the indictment. The district court sentenced Spikes to a mandatory term of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). This appeal followed.

## II. ANALYSIS

### A. Evidence Seized at 505 North State Street

The defendants have asserted two reasons why they believe the evidence seized at 505 North State Street should have been suppressed. The first concerns the information contained in the affidavit submitted in support of the search warrant. They argue that the information had become "stale" by the time the police applied for the warrant. The second reason relates to the manner of the warrant's execution; specifically, that the police did not wait a reasonable amount of time after announcing their presence before they entered the residence.

█ We conduct a *de novo* review of a district court's legal conclusions concerning a motion to suppress. *United States v. Bates*, 84 F.3d 790, 794 (6th Cir.1996). The district court's factual findings, however, will be set aside only if they are clearly erroneous. *Id.* In addition, the evidence must be viewed in a light most favorable to the party that prevailed in the district court. *Id.* The ultimate

question of whether the search or seizure is reasonable under the Fourth Amendment remains subject to *de novo* review. *See Whitney v. Brown,* 882 F.2d 1068, 1071 (6th Cir. 1989).

### 1. Stale Information

With respect to the staleness issue, the defendants contend that the affidavit relies on facts with a vintage of more than four years, concerns instances of criminal conduct at places other than 505 North State Street, and fails to connect either of them with any of the alleged criminal activities. The government, on the other hand, maintains that the affidavit documents an ongoing pattern of criminal activity with 505 North State Street serving as its focal point. In addition, the government notes that recent facts listed in the affidavit relating to 505 North State Street served to update and refresh any otherwise stale information.

 "The question of probable cause sufficient for the issuance of a search warrant is, of course, directed in the first instance to the [magistrate.]" *Schoeneman v. United States,* 317 F.2d 173, 176 (D.C.Cir. 1963). In making that determination, a magistrate must "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "In reviewing a state magistrate's determination of probable cause, this court pays great deference to a magistrate's findings, which should not be set aside unless arbitrarily exercised." *United States v. Leake,* 998 F.2d 1359, 1363 (6th Cir.1993) (internal quotation marks omitted). In the end, a warrant will be upheld if there was a "'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Id.* (quoting *United States v. Pelham,* 801 F.2d 875, 877–78 (6th Cir.1986)). Thus, the critical question is whether the information contained in the affidavit, when presented to the state court judge, established that there was a fair probability that illegal drugs

would still be found at 505 North State Street.

 Because probable cause to search "is concerned with facts relating to a presently existing condition," W. LaFave, Search and Seizure § 3.7 at 338 (3d ed.1996), there arises the "unique problem of whether the probable cause which once existed has grown 'stale.'" *Id.* at 339. The Supreme Court addressed this issue in *Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). There, the Court noted that whether information contained in an affidavit is stale "must be determined by the circumstances of each case." *Sgro,* 287 U.S. at 210–211, 53 S.Ct. 138. In judging the "circumstances of each case," the length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling.

 As this court recognized in *United States v. Henson,* "[t]he function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." 848 F.2d 1374, 1382 (6th Cir. 1988). Rather, the question of staleness depends on the "inherent nature of the crime." *Id.* Instead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), *etc.*" *Andresen v. State,* 24 Md.App. 128, 331 A.2d 78, 106 (1975). As these variables demonstrate, even if a significant period has elapsed since a defendant's last reported criminal activity, it is still possible that, depending upon the nature of the crime, a magistrate may properly infer that evidence of wrongdoing is still to be found on the premises. *See United States v. Greany,* 929 F.2d 523, 525 (9th Cir.1991) (holding information not stale even though an informant said that two years ago he had remodeled defendant's premises to allow him to grow

marijuana on second floor, with the court emphasizing that the information showed "an ongoing criminal business of a necessarily long-term nature"); *see also United States v. Johnson*, 461 F.2d 285, 287 (10th Cir.1972) (stating the general principle that when "the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant").

▮ The affidavit in the present case described a continuing criminal enterprise involving the manufacture and trafficking of crack cocaine over a four-year period of time. Except for the period Spikes spent in jail from 1992 until 1994, the affidavit provides a continuing series of incidents involving either the manufacture, sale, or distribution of crack cocaine that are all connected in one form or another to 505 North State Street. Just two months before the police applied for the search warrant, an informant told law enforcement authorities that 505 North State Street had become the primary source of crack cocaine in town and that the illegal substance was regularly being manufactured on the premises. Only a month before the warrant application, authorities learned that "workers" equipped with pagers were distributing crack cocaine from 505 North State Street to a nearby bar where the drugs were later sold. And just 10 days before Special Agent Smith applied for the warrant, LCNA agents uncovered a number of items in the trash at 505 North State Street that were consistent with an ongoing drug-trafficking operation.

▮ This court has observed that "[w]here recent information corroborates otherwise stale information, probable cause may be found." *Henson*, 848 F.2d at 1381–82 (quoting *Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir.1987) (internal quotations omitted)). Thus, even assuming the information in the affidavit was in some respects "stale," the more recent events· related therein refreshed this otherwise stale information. Indeed, these more recent events indicated that the crack cocaine operation at 505 North State Street had in fact intensified and expanded in scope. When presented with similar scenarios in the past, this court has found

probable cause to support the issuance of the warrant. *See United States v. Word*, 806 F.2d 658, 662 (6th Cir.1986) (affidavit referring to a doctor's sale of drugs over four months earlier was upheld because of evidence that the crime was "of a continuing nature").

Because the affidavit contained information demonstrating that the drug activity at 505 North State Street was of an ongoing and continuous nature, and that the premises served as the operational base for drug traffickers, we affirm the district court's denial of the motion to suppress the evidence on the grounds of staleness.

### 2. Knock and Announce Rule

The defendants next argue that the police failed to comply with the "knock and announce" rule by not waiting long enough after knocking and announcing their presence before entering the residence. They would have us evaluate the police officers' actions by looking only at the time from when the officers first knocked on the door until they entered the house, *i.e.*, four seconds. They also argue that we should evaluate the constitutionality of this time frame solely with reference to the well-developed case law concerning 18 U.S.C. § 3109, the federal "knock and announce" statute. This statute provides in pertinent part as follows: "The officer may break open any outer or inner door or window of a house ... to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance...."

At common law, it was held that "when the King is [a] party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the King's process, if otherwise he cannot enter." *Semayne's Case*, 77 Eng. Rep. 194, 195 (K.B.1603). Before the King's agents were allowed to break into a home, however, the common law required that they "first signify to those in the house the cause of [their] coming, and request them to give admittance." 2 W. HAWKINS, PLEAS OF THE CROWN, ch. 14, § 1, at 138 (6th ed. 1787). This principle soon came to be known as the "knock and announce" rule and was "woven

quickly into the fabric of early American law." *Wilson v. Arkansas,* 514 U.S. 927, 933, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). As it later developed in the United States, the rule came to stand for the following:

> [Before the police execute a warrant] they must identify themselves as police and indicate that they are present for the purpose of executing a search warrant.... Once having given the required notice, the officer must wait a reasonable period of time before he may break and enter into the premises to be searched.

LaFave, § 4.8(c) at 607–608.

■ In *Wilson,* the Supreme Court held "that this common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." 514 U.S. at 929, 115 S.Ct. 1914. The Court also noted that the Fourth Amendment's reasonableness requirement is "flexible" and "should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *Id.* at 934, 115 S.Ct. 1914. At its core, the "knock and announce" rule serves to respect the sanctity of a person's home by affording notice to those inside so that they may open the door peaceably and without the needless destruction of property, as well as by avoiding the possibility of a violent confrontation if those inside mistook the police for intruders. *See United States v. Bates,* 84 F.3d 790, 794 (6th Cir.1996).

■ The defendants neither challenge the fact that the officers knocked before entering nor do they dispute that the officers gave notice of their authority and purpose. Rather, the defendants' sole argument is that by waiting only four seconds after knocking on the door, not enough time had elapsed for the officers to conclude that they had been refused admittance. They contend that this "measuring stick" is required because knocking on the door or taking some similar action is a literal component of the "knock and announce" rule. We disagree.

■ The focus of the "knock and announce" rule "is properly not on what 'magic words' are spoken by the police," or whether the police rang the doorbell, "but rather on how these words and other actions of the police will be perceived by the occupant." *United States v. One Parcel of Real Property,* 873 F.2d 7, 9 (1st Cir.1989). The proper trigger point, therefore, is when those inside should have been alerted that the police wanted entry to execute a warrant. *See United States v. Smith,* 63 F.3d 956, 962 (10th Cir.1995) (noting that "[a]lthough the principle is commonly referred to as 'knock and announce,' the Court's holding in *Wilson* requires only an announcement"). This "measuring stick" comports more with the purpose of the rule—that a homeowner "know who is entering, why he is entering, and ... be given a reasonable opportunity to surrender his privacy voluntarily." LaFave, § 4.8(a) at 599–600 (citations and quotation marks omitted).

■ Thus, whether the officers in the present case waited a reasonable amount of time before entering the residence is to be measured from when Captain Bruno first announced over the police bullhorn "Sheriff's office, search warrant, sheriff's office, search warrant, come out of the house, open your door." It was at that point that any occupant inside 505 North State Street should have understood that the police "want in, presumably to search and arrest, not census-taking." *One Parcel,* 873 F.2d at 9. With that in mind, the critical question becomes whether 15 to 30 seconds (the time from the initial use of the police bullhorn until the officers entered the home) was a reasonable amount of time for the officers to wait before entering the residence.

■ Although deeply rooted in the common law, the "knock and announce" principle is a recent concept in Fourth Amendment jurisprudence. This court has not squarely addressed how long the Fourth Amendment requires officers to wait before entering a residence after they have announced their presence. In answering this question, the defendants would have us look solely to the case law concerning the federal "knock and announce" statute, 18 U.S.C. § 3109, wherein a delay of five seconds or less after officers have knocked and announced their presence has been held to violate the statute. *See United States v. Nabors,* 901 F.2d 1351, 1355

(6th Cir.1990) (forced entry only seconds after announcing the officers' authority and purpose must be "carefully scrutinized"). Because the proper measuring stick in this case is that of 15 to 30 seconds, the defendants' reliance on the case law developed under § 3109 actually works to their detriment. Nonetheless, we decline their invitation to create a bright-line rule for every case, *i.e.*, that waiting less than five seconds is *per se* unreasonable while waiting more than five seconds is *per se* reasonable under the Fourth Amendment.

The Fourth Amendment's "knock and announce" principle, given its fact-sensitive nature, cannot be distilled into a constitutional stop-watch where a fraction of a second assumes controlling significance. As the Fifth Circuit stated in *United States v. Jones:* "It is possible that a delay in a particular case might be too short to imply refusal of admittance under § 3109, but would be reasonable for Fourth Amendment purposes because of exigent circumstances such as the potential for destruction of evidence or danger to law enforcement officers or innocent occupants." 133 F.3d 358, 361 (5th Cir.1998). Nevertheless, because § 3109's requirement of prior notice before entry is also derived from the common-law tradition, the manner in which courts have dealt with factually similar scenarios under § 3109 still provides a useful guidepost in examining questions concerning the "knock and announce" rule. *See United States v. Ramirez,* —— U.S. ——, ——, 118 S.Ct. 992, 997, 140 L.Ed.2d 191 (1998).

As noted earlier, the "knock and announce" rule is to be applied under the "flexible requirement of reasonableness." *Wilson,* 514 U.S. at 934, 115 S.Ct. 1914. Whether police officers paused long enough before admitting themselves into a home thus entails "a highly contextual analysis, [requiring] examin[ation of] all the circumstances of the case." *United States v. Bonner,* 874 F.2d 822, 824 (D.C.Cir.1989). Applying this fact-specific methodology, we note that several features of this case strongly support the conclusion that the police officers waited a reasonable amount of time before they entered 505 North State Street.

First, the officers were searching for drugs. Prior to executing the warrant, the officers were made aware that there were persons inside the residence that might destroy such evidence before it could be seized. "In drug cases, where drug traffickers may easily and quickly destroy the evidence of their illegal enterprise by simply flushing it down the drain, 15 to 20 seconds is certainly long enough for officers to wait before assuming the worst and making a forced entry." *Jones,* 133 F.3d at 362; *see also United States v. Moore,* 956 F.2d 843, 850 (8th Cir.1992) ("It is reasonable for police officers to assume that suspects selling illegal drugs in small quantities from a residence that has normal plumbing facilities will attempt to destroy those drugs"). This reality, however, must be balanced against the fact that the simple presence of drugs alone does not justify abandoning the "knock and announce" rule or so diluting its requirements that it becomes a meaningless gesture. *See Richards v. Wisconsin,* 520 U.S. 385, —— – ——, 117 S.Ct. 1416, 1420–21, 137 L.Ed.2d 615 (1997) (rejecting "creating exceptions to the knock-and-announce rule based on the 'culture' surrounding a general category of criminal behavior," *i.e.,* drugs). Thus the presence of drugs in the place to be searched, while not a conclusive factor, lessens the length of time law enforcement must ordinarily wait outside before entering a residence.

Second, immediately prior to executing the warrant, the officers were warned that 505 North State Street was the residence of drug traffickers who had taken measures to defend themselves and their drugs. Such measures included the use of police scanning equipment, the placement of lookouts in various strategic places within the home, and, most importantly, the presence of guns and armed guards. Given these defensive measures, the officers did not need to wait long enough for a barrage of bullets from within before concluding that they had given the occupants enough time to respond to their request for entry. *See Bonner,* 874 F.2d at 825. "Once police officers seeking to enter a drug trafficker's enclave have announced their identity and authority, they stand before the door blind and vulnerable. In such

a danger-fraught situation, the officers may quite reasonably infer refusal more readily than under other circumstances." *Id.* at 824.

Third, the police executed the warrant during the middle of the morning when most people are awake and engaged in everyday activities. The amount of time officers need to wait before entering a home necessarily depends on how much time it would take for a person in the house to open the door. When the police execute a warrant in the dead of night or have some other reason to believe that a prompt response from the homeowner would be unlikely, the length of time the officers should wait increases. *See Griffin v. United States,* 618 A.2d 114, 121 (D.C.App.1992) (entering a person's home after a thirty second wait at 1:40 a.m. was held to be unreasonable because "at that time of night, most people are in bed, and many are asleep"). Correspondingly, when officers execute a warrant in the middle of the day or have requested admittance from the occupant face-to-face, the length of time the officers must tarry outside diminishes. *See United States v. Kemp,* 12 F.3d 1140 (D.C.Cir.1994); LaFave, § 4.8(c). When the police entered 505 North State Street in mid-morning, the chance that those inside the home would not hear and have an opportunity to respond to the officers' request for entry within 15 to 30 seconds was slim.

Finally, the method used by the police to alert those inside of their presence—the bullhorn—was so effective that neighbors had already exited their homes to observe the execution of the warrant before the police made their entry into the residence. When the execution of a warrant becomes a spectator sport, common sense dictates that the "knock and announce" rule has been complied with. *See United States v. Wood,* 879 F.2d 927, 932 (D.C.Cir.1989) (noting that because "dogs [near the house] were barking while the officers were approaching and actually knocking on the door" officers had given "the occupants a reasonable opportunity to respond").

Given the possible destruction of evidence, the potential for gunfire, the time of day the warrant was executed, and the reactions of nearby neighbors to the officers' efforts in announcing their presence, we are satisfied that the officers did not violate the Fourth Amendment's "knock and announce" rule by waiting 15 to 30 seconds before entering the residence. Accordingly, we affirm the district court's denial of the suppression motion.

**B. Trial Issues**

On appeal, Spikes focuses primarily on two evidentiary rulings made by the district court: (1) the admission of the inculpatory portions of his statement to police on the grounds that he had "opened the door" on the subject, and (2) that the probative value in admitting Limoli's testimony under Rule 404(b) was not substantially outweighed by its prejudicial effect. We review such evidentiary rulings under an "abuse of discretion" standard. *See United States v. Foster,* 128 F.3d 949, 954 (6th Cir.1997). A trial court abuses its discretion "when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,* 753 F.2d 1354, 1356 (6th Cir.1985).

**1. Informal Agreement Concerning Spikes's Statement to Police**

Spikes claims that the district court erred in allowing the jury to hear the inculpatory portion of his statement to the police. Prior to trial, the government and Spikes's counsel had informally agreed that neither would attempt to introduce this portion of the statement into evidence. By the court releasing the government from its obligations under the informal agreement, Spikes claims that he suffered unfair prejudice because he had detrimentally relied upon the existence of the informal agreement in crafting his defense strategy.

Although this court has never addressed the significance that informal agreements between the government and the defense have on the conduct of a trial, the Fourth Circuit confronted this question in *United States v. Cole,* 857 F.2d 971 (4th Cir.1988). In *Cole,* defense counsel entered into an informal agreement with the government concerning evidence that the government was obligated

to turn over before trial. Relying upon this informal agreement, defense counsel accepted the government's assertion that it had turned over all the information that it had which made any reference to the defendant. But the government at trial, without any previous disclosure to the defense, then introduced a witness who testified to defendant's admission that he was a drug dealer. *Cole*, 857 F.2d at 974.

On appeal, the Fourth Circuit held that the district court erred in admitting the witness's testimony. *Id.* at 976. The court first observed that it is paramount that "when a prosecutor enters into an informal discovery agreement he must abide by its spirit as well as its letter. To do otherwise would allow the means to subvert the ends of justice." *Id.* Elaborating upon this principle, the court held: "If the government's breach of the discovery agreement had actually prejudiced the defendant[ ] . . ., we would not hesitate to reverse the[ ] . . . conviction[ ]. . . ." *Id.* Although the trial court erred in admitting the statement into evidence, the court held that such error was harmless because "[w]hen viewed in light of the overwhelming evidence of guilt in this case, the impact of this admission begins to pale." *Id.*

■ We agree with the Fourth Circuit's approach. When the government and the defense enter into an informal agreement, both sides should be able to rely on the other to honor the same. Allowing one side to disregard its obligations under the agreement with impunity raises troubling issues concerning the overall fairness of the trial. Parties naturally structure a trial strategy, including decisions on which witnesses to call and what motions to file, that takes into account the terms contained in such informal agreements. Where one side's efforts at presenting its theory of the case is actually prejudiced by the other side reneging on its obligations under the agreement, some form of relief is appropriate. *Cf. Cole*, 857 F.2d at 976; Fed.R.Crim.P. 16(d)(2) (providing a wide variety of sanctions a district court may impose against a party for failure to comply with proper discovery requests). In sufficiently egregious circumstances, the suppression of evidence or the dismissal of the case altogether might be called for. *See Cole*, 857 F.2d at 976 (noting that the reversal of the defendant's conviction may be warranted where the breach of the agreement results in actual prejudice).

In the present case, however, it was *defense* counsel's actions that violated the spirit, if not the letter, of the parties' agreement. According to the terms of the agreement, neither side was to inquire about the inculpatory portion of Spikes's statement. In its direct examination of the agent who elicited the inculpatory statement, the government posed an open-ended question that allowed the agent to respond in a truthful manner; specifically, that Spikes "primarily" said that he did not know there were drugs in the house. During the cross-examination of the agent, in contrast, Spikes's counsel posed questions to the agent that he could not fairly answer without referring to the inculpatory portion of the statement. In so doing, defense counsel left the jury with the false impression that Spikes had consistently denied knowing there were drugs in the house. This misleading cross-examination opened the door for the limited use of the inculpatory statements in order to clear up the false impression conveyed to the jury.

■ Spikes maintains that admitting the incriminating statement was error, regardless of whether he opened the door on the topic, because the statement was otherwise subject to Rule 16(d)(2) discovery sanctions. To the contrary, this court has consistently held that the admission of suppressed evidence is permissible when the defendant has opened the door on the topic. *See United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) ("When one party has 'opened the door' on an issue, by eliciting prejudicial or inadmissible testimony, 'an opponent, in the court's discretion [may] introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission'" (alteration in original)); *United States v. Ramos*, 861 F.2d 461, 468 (6th Cir.1988) (holding that defense counsel's cross-examination of a witness opened the door for the admission of the suppressed co-conspirator's statement). The fact that a portion of the statement was "suppressed"

by mutual agreement of the parties, as opposed to by the court, does not change this analysis. In either case, it is the defendant's own actions in "opening the door" that results in the statement becoming admissible. Accordingly, we hold that the district court did not abuse its discretion when it allowed the government to bring out the inculpatory portions of Spikes's statement in order to clear up the false impression created by defense counsel's cross-examination of the agent.

### 2. Limoli's Testimony

We employ a three-step analysis in reviewing a district court's decision to admit evidence of "other crimes, wrongs, or acts" under Rule 404(b). First, we review the district court's factual finding that the "other acts" occurred under the clearly erroneous standard. *United States v. Jobson,* 102 F.3d 214, 220 (6th Cir.1996). Second, the district court's finding that the evidence was admissible for a legitimate purpose is reviewed *de novo. Id.* Finally, we review the district court's conclusion that the probative value of the "other acts" evidence is not substantially outweighed by its prejudicial effect under the abuse of discretion standard. *Id.* It is this last step in the analysis where Spikes claims that the district court went astray.

Rule 404(b) provides in relevant part as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

When the government seeks to introduce Rule 404(b) evidence, "the information unquestionably has a powerful and prejudicial impact." *United States v. Johnson,* 27 F.3d 1186, 1193 (6th Cir.1994). Jurors are allowed to "hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial." *Id.* By branding the defendant with his past crimes and misdeeds, such evidence has the natural tendency to elicit the jury's opprobri-

um for the defendant and to judge him accordingly. Thus, even when "other acts" evidence is admissible under Rule 404(b), "the likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered; to suggest that the defendant is a bad person ... and that if he 'did it before he probably did it again.'" *Id.* Because of the increased risk that the jury will misuse "other acts" evidence, a trial court "must carefully identify, in its instructions to the jury, the specific factor named in the rule that is relied upon to justify admission of the other acts evidence, explain why that factor is material, and warn the jurors against using the evidence to draw the inferences expressly forbidden in the first sentence of Rule 404(b)." *Id.* at 1194; *see also United States v. Merriweather,* 78 F.3d 1070, 1077 (6th Cir.1996) ("the district court must 'clearly, simply, and correctly' instruct the jury as to the *specific* purpose for which they may consider the evidence"). The district court in the present case failed to do this.

The district court gave two separate and inadequate instructions on the proper purpose for which the jury could use Limoli's testimony. In its first instruction, the district court only informed the jury on what it could *not* use the testimony for: "evidence of his guilt of the crimes charged." While in the second limiting instruction the court did list some proper purposes for using Limoli's testimony, it never limited the use of the testimony to those purposes. Rather, the jury was informed that they could use the testimony as it related to the events on the day in question, *"including* the defendant's opportunity, intent, or knowledge." (emphasis added).

In its first limiting instruction, the district court plainly erred by not informing the jury as to what specific purpose the "other acts" evidence could be used for. As this court emphasized in *Johnson,* trial courts must carefully identify for the jury the specific purpose listed in the rule that is relied upon to justify admission of the "other acts" evidence and then explain why that purpose is material to the case. 27 F.3d at 1193. The district court's first instruction did neither.

Instead, the jury was left to identify for themselves the proper purpose of the evidence and then decide how that self-identified purpose was material to the case. Without providing more specific direction to the jury, the instruction heightened the risk that the jury would be confused or unsure on what the extrinsic evidence was meant to show. In such a situation, it is only logical for the jury to use the evidence for the one purpose that most immediately comes to mind—"that the defendant is a bad person ... and that if he 'did it before he probably did it again.'" *Id.*

The district court also erred in the second instruction it provided to the jury. While the instruction informed the jury that it could consider Limoli's testimony "only as it may relate to the events of August 11, 1995," the court added that this *included* Spikes's "opportunity, intent, or knowledge." Opportunity, however, was never at issue during the trial; Spikes admitted that he had been inside the house prior to the search. Intent and knowledge, on the other hand, were proper purposes for admitting the testimony. Spikes's defense at trial was that he did not know there were drugs in his residence. Moreover, this court has held that Rule 404(b) evidence is admissible to prove intent if specific intent is a statutory element of the offense. *Johnson,* 27 F.3d at 1192. Possession with the intent to distribute is such an offense. *Id.* at 1193.

The problem with the second limiting instruction, however, is that the district court did not confine the jury's consideration of Limoli's testimony to these two permissible purposes. The court instead only noted that those two purposes were among the ones the jury could use the testimony to prove. In order to apply Rule 404(b) properly, however, trial courts must " 'clearly, simply, and correctly' instruct the jury" as to the specific purpose for which the evidence may be considered. *Johnson,* 27 F.3d at 1193. Here, the district court instructed the jury that it could use the testimony as it related to the events on August 11, including proving Spikes's opportunity, intent, or knowledge. The district court's use of the word "including" in relation to its discussion of the per-

missible purposes for which the evidence could be used clearly signaled to the jury that the evidence could be used for other purposes in addition to those the court had identified. Providing the jury with such an open-ended "limiting" instruction carries with it the same problems as providing the jury with no specific purpose for considering the "other acts" evidence.

Further exacerbating the prejudicial effect of Limoli's testimony was the district court's failure to limit the scope of her testimony to the telephone conversations with Spikes on August 10 and 11. As the Fifth Circuit has noted: "It is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice." *United States v. Cathey,* 591 F.2d 268, 277 (5th Cir.1979). The government clearly could have made its point concerning Spikes's knowledge and intent from the content of the telephone conversations, without having to further detail how Spikes ran his drug operation over a two-year period. Given that the district court did not properly limit the scope of Limoli's testimony or deliver adequate limiting instructions that would reduce the risk that the jury would misuse the evidence, we conclude that the district court abused its discretion in its handling of the "other acts" evidence. *See Merriweather,* 78 F.3d at 1078 (noting that delivering faulty limiting instructions to the jury in conjunction with failing to limit the scope of the "other acts" evidence that was admitted at trial constituted an abuse of discretion).

Despite our conclusion concerning the district court's handling of Limoli's testimony, in the end we find the error to be harmless. "In determining whether an error is harmless, we 'must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened.'" *Merriweather,* 78 F.3d at 1079 (quoting *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (alteration in original)). In this case the jury was also presented with the following evidence: large sums of cash were found with Spikes in the upstairs bedroom; crack cocaine and other incidents of drug trafficking were lying in plain view throughout the

first floor of the house; the incriminating statement made by Spikes to the police that he knew there were drugs in the residence; the testimony of a jailhouse informant who related Spikes's admission that the drugs seized on August 11, 1995 belonged to him and that Smith was going to take the rap for the drugs; Limoli's conversations with Spikes on August 10 and 11, 1995, wherein he made essentially the same admissions to her that he made to the jailhouse informant; and finally the inference the jury could legitimately draw of the improbability that Spikes had no knowledge of all this drug activity taking place within his own residence. Given this overwhelming evidence of Spikes's guilt, we are confident that the jury's verdict "was not substantially swayed" by the improper admission of the "other acts" evidence. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

## C. Sentencing

 Spikes also argues that the district court erred in the sentence it imposed upon him because his two prior convictions cannot stand as predicate "felony drug offenses" for a mandatory term of life imprisonment under 21 U.S.C. § 841(b). As Spikes's claim concerns an issue of statutory interpretation, our review is *de novo. See United States v. Stephens,* 118 F.3d 479, 481 (6th Cir.1997).

Under 21 U.S.C. § 841(b)(1), the mandatory term of imprisonment for a violation of § 841(a) (possession of drugs with intent to distribute) increases if the defendant has a prior conviction for a felony drug offense. In particular, if a defendant has "two or more prior convictions for a felony drug offense [that] have become final, such person shall be sentenced to a mandatory term of life imprisonment without release." 21 U.S.C. § 841(b)(1). A felony drug offense is one "that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant or stimulant substances." 21 U.S.C. § 802(44).

Spikes does not dispute that his prior Ohio state convictions for attempted aggravated drug trafficking and felony drug abuse are final, or that they otherwise qualify as felonies. Spikes instead argues that neither conviction falls within the sphere of conduct covered by § 841(b)(1). Spikes first contends that a conviction for attempted aggravated drug trafficking is not a "drug offense" because the relevant Ohio statute on criminal attempt does not require the government to prove that he had the specific intent to commit an underlying drug offense.

The Ohio statute in question provides as follows:

> No person, purposefully or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.

OHIO REV.CODE ANN. § 2923.02(A) (Anderson 1997).

Spikes claims that the conduct addressed in Ohio's criminal attempt statute is analogous to criminal facilitation, which has been held not to count as a "drug offense" because such a crime does not "require any mental culpability either to commit or to otherwise participate in the underlying substantive [narcotics] offense." *United States v. Pazzanese,* 982 F.2d 251, 254 (8th Cir. 1992); *see also United States v. Liranzo,* 944 F.2d 73, 79 (2d Cir.1991) (noting that because New York's criminal facilitation statute does require "the mental culpability to commit a substantive narcotics offense," a defendant's conviction under such the statute could not be used to enhance his sentence). The analogy that Spikes seeks to draw between criminal attempt and criminal facilitation, however, quickly collapses upon a closer examination of Ohio's criminal attempt statute.

 Unlike the elements necessary for a conviction of criminal facilitation, Ohio's attempt statute has been interpreted to require that the defendant have the specific intent to engage in the underlying substantive offense, and that he took steps toward completing that offense. *See City of Youngstown v. Osso,* 115 Ohio App.3d 416, 685 N.E.2d 593, 594 (1996) ("Proof of an attempt to commit a

crime requires a showing of mens rea of purpose or knowledge as well as conduct toward the commission of the crime"). Spikes's conviction for attempted aggravated drug trafficking thus qualifies as a predicate "felony drug offense" under § 841(b)(1). *See also Liranzo,* 944 F.2d at 79 ("unlike the crimes of aiding and abetting, conspiracy, *or attempt,* the crime of criminal facilitation does not involve the *intent* to commit the underlying substantive offense" (first emphasis added)).

 Spikes also argues that application of the sentence-enhancement provisions of § 841(b)(1) is not triggered by a conviction for felony drug abuse because such an offense criminalizes the "mere" possession of drugs. Essentially, Spikes contends that in order for a prior drug conviction to count as a "felony drug offense" under § 841(b)(1), the crime must involve possession of drugs plus some additional element, such as their manufacture or distribution. Both the Fifth and Eleventh Circuits have rejected similar arguments as that advanced by Spikes. *See United States v. Sandle,* 123 F.3d 809, 812 (5th Cir.1997); *United States v. Hansley,* 54 F.3d 709, 717–18 (11th Cir.1995).

Looking to the definition for "felony drug offense" provided in § 802(44), both courts noted that the plain meaning of the term "includes *any* criminal conduct relating to narcotics, including simple possession, which a state has proscribed as a felony." *Hansley,* 54 F.3d at 718; *see also Sandle,* 123 F.3d at 812 (quoting *Hansley*). The courts next observed that in a different recidivist section predicated on the commission of a prior "serious drug offense," Congress specifically limited application of the sentencing enhancement to prior offenses "involving manufacturing, distributing, or possessing with intent to manufacture or distribute a controlled substance." 18 U.S.C. § 924(e)(2)(A)(ii). Because Congress had drafted one section to exclude sentence enhancements based on simple drug possession crimes (as evidenced by 18 U.S.C. § 924(e)) and had failed to do so when drafting § 841(b)(1), the courts concluded that "Congress intended no such limitation to apply in section 841(b)(1)(A)." *Sandle,* 123 F.3d at

812; *Hansley,* 54 F.3d at 718 ("We can only conclude that if Congress meant to place a similar limitation on section 841(b)(1)(A), it would have used the 'serious drug offense' language [found in § 924(e) ] and it would have provided a similar definition").

We find the reasoning in *Hansley* and *Sandle* persuasive. Nothing in the statutory definition for "felony drug offense" remotely hints at the "possession plus" gloss Spikes seeks to add to the statute. Instead, § 802(44) only requires that the state statute criminalize conduct "relating" to drugs. The use of the expansive term "relating" as the only substantive limitation on the reach of the statutory phrase "felony drug offense" clearly indicates that the statute encompasses drug offenses that involve the simple possession of drugs. Spikes's attempt to use the more narrow definition of "controlled substance offense" found in § 4B1.2(2) of the Sentencing Guidelines to inform his analysis concerning § 802(44)'s definition of "felony drug offense" is misdirected. "[W]e have no need to utilize the guidelines where the statute plainly mandates a more severe sentence." *Sandle,* 123 F.3d at 812.

Spikes's prior Ohio state convictions for attempted aggravated drug trafficking and felony drug abuse were therefore properly considered as prior "felony drug offenses" so as to enhance Spikes's sentence to a mandatory life term.

## D. Remaining Issues

In addition to the above issues, Spikes claims that: (1) there was insufficient evidence to support the jury's guilty verdicts; (2) the district court erred in the charge it delivered to the jury concerning the element of intent to distribute drugs; (3) Spikes's two prior drug convictions should have been treated as a single offense because he pled guilty to both in the same proceeding before the same judge; and (4) life imprisonment based upon his prior drug convictions constitutes cruel and unusual punishment. We have carefully considered all the arguments on these issues and have reviewed the relevant portions of the record and applicable case law. Finding each of these claims to be

without merit, the district court's rulings on the issues listed above are affirmed.

## III. CONCLUSION

For all the reasons stated above, we **AFFIRM** the district court's decision denying the defendants' motion to suppress and **AFFIRM** Spikes's conviction and sentence.