RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LATHERIAN HARRIS,

        *Plaintiff-Appellee/Cross-Appellant*,

    *v.*

CITY OF SAGINAW, MICHIGAN, et al.,

        *Defendants*,

MEGAN NELSON; JORDAN LADOUCE; TYLER CECE;
STEVE LAUTNER,

        *Defendants-Appellants/Cross-Appellees*.

Nos. 22-1504/1505

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:20-cv-13075—Thomas L. Ludington, District Judge.

Decided and Filed: March 20, 2023

Before: COLE, GIBBONS, and READLER, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:** Kailen C. Piper, O'NEILL, WALLACE & DOYLE, Saginaw, Michigan, for Appellants/Cross-Appellees. Amy Jean DeRouin, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee/Cross-Appellant.

─────────────────

**OPINION**

─────────────────

COLE, Circuit Judge. After Latherian Harris called 911 to report that a store clerk had pulled a gun on him, four officers arrived on scene. Believing Harris lied about the assault, the officers arrested Harris for allegedly filing a false felony report. Harris spent 18 days in jail as a

result. Harris later sued the officers, the detective who submitted the police report, and the City of Saginaw for false arrest and imprisonment. He also sued the City for failure to train and supervise the arresting officers. On cross-motions for summary judgment, the district court denied Harris's motion in full, denied qualified immunity to the officers, granted qualified immunity to Detective Busch, and dismissed Harris's failure-to-train and failure-to-supervise claims. Because there is a genuine dispute of material fact regarding whether the on-scene officers arrested Harris without probable cause, but no dispute as to Detective Busch or the City of Saginaw's actions, we affirm.

## I. BACKGROUND

On November 10, 2018, Latherian Harris went to Liquor Valley ("the store") to purchase beer for a friend. Harris and one of the store clerks got into a verbal dispute after the clerk asked him to turn his music down, and Harris offered to fight the clerk outside. Harris left the store—purchaseless—and made his way to Warwick Cleaners, the laundromat next door where his friend, Donald Henderson, worked. Harris asserts that while he was walking between the store and the laundromat, the "tall" clerk came out the back door near a white van, pointed and cocked a gun at him, and taunted him with racial slurs. He recounted this altercation to Henderson, who suggested he call 911.

Following Harris's 911 call, four officers—Officers Tyler Cece, Jordan LaDouce, Steve Lautner, and Megan Nelson (collectively, the "Officers")—were dispatched to the store. Harris described his encounter with the store clerks, beginning with the music dispute and ending with the gun being pulled on him. While pointing toward the alley between the store and the laundromat, Harris relayed the following:

> I cut through there through the, um, through the, um, store, it's like a little alley right here, I cut right through from the store to the—from the laundromat to the store you can cut right through here where that vans [sic] at. And, um, the guy came—the tall guy came all the way back to that van and pulled the, um, he cocked it back. It's like a black—all black like a nine-millimeter cocked it back and pointed at me and say, "I'll kill you, n*gger." Then he said, "Where's your mama? Where's your daddy? How many dad's [sic] you got?"

(Op. and Order, R. 54, PageID 942 (footnote omitted) (quoting LaDouce Bodycam 1, R. 32, Ex. 5, at 1:21–47).) Notably, at least one officer expressed disbelief in Harris's report before even hearing his recitation of what occurred, and others expressed their doubt during and following his initial description of the altercation. (Nelson Body Cam 1, R. 32, Ex. 8, at 0:32 ("This guy's a f*cking liar."); LaDouce Bodycam 1, R. 32, Ex. 5, at 3:02–04 (laughing and saying "you realize how ridiculous this sounds, right?"), 4:07–09 ("Yeah there is definitely more to this story."), 4:32–40 ("It's a little bit hard to believe."), 5:17–20 ("Bull sh*t" and then recording ends).).)

After Harris finished his first description, Nelson entered the store and spoke with the store clerks. The taller of the two clerks denied having a gun, pulling a gun on Harris, or going outside of the store. Nelson told the other officers that "it sounds like exactly what [Harris] said but opposite," and asked to see security footage. Though the store had at least three surveillance cameras, the Officers requested and watched only one surveillance camera's footage: the camera showing "right outside the store" by "this door that you guys were at," referring to the front door, because they "don't care about what happened [inside]." (LaDouce Bodycam 2, R. 32, Ex. 6, at 1:23–37, 2:23–27.) Based on the understanding that the clerk neither exited nor pulled a gun out by the front door, Nelson announced, "let's go arrest him" because "that's good enough for [them]." (Nelson Bodycam 1, R. 32, Ex. 8, at 18:30–38.) Lautner separately decided to arrest Harris if he insisted on filing his police report, a decision with which LaDouce agreed. (LaDouce Bodycam 2, R. 32, Ex. 6, at 12:34–39.)

Harris confirmed his desire to move forward with his report, believing the footage the Officers watched would have corroborated his account. The Officers indicated that the video revealed Harris had lied, and proceeded to arrest Harris while he insisted that he was telling the truth. Nelson, Cece, and LaDouce physically restrained and handcuffed Harris. While being placed in the police car, Harris became increasingly emotional, began crying, and continued to attest to his truthfulness.

Nelson's body camera also showed the other officers talking to Harris's friend, Henderson. Henderson confirmed that he suggested Harris call 911 based on what Harris

relayed to him and explained that Harris told him the clerk pulled the gun by the back door. Despite confirming they took Henderson's information, no officer took Henderson's statement.

Harris continued to sob and repeatedly attempted to persuade Nelson that he was telling the truth as she drove him to jail. During the drive, Nelson called Lautner to ask for "a favor": to record the surveillance footage they had watched earlier—specifically, the footage "showing that [the clerk] never even went out after [Harris]." (Nelson Bodycam, R. 34, Ex. 27, at 2:01–18.) LaDouce and Lautner returned to the store to request the footage, informing the clerk that they arrested Harris and that "[Harris] is trying to get [the clerks] in trouble." (LaDouce Bodycam 3, R. 32, Ex. 7, at 1:01–18.) The two officers also asked about the store's back door, which they proceeded to go to, look at, and open, thereafter concluding that "this guy's f*cking lying [because] you guys aren't gonna go through all that," referring to the path they took to get to the back door. (*Id.* at 1:22–2:24.) Despite Harris asserting the altercation occurred by a white van near the back door, neither officer confirmed if a white van was visible from the back door that they had just looked out. The two officers and the store clerk then went to record the surveillance footage viewed earlier. Again, the two officers requested only the front door footage, which they knew would show "when [Harris] is outside and [the clerk] coming out the two times that [he] did . . . with nothing in [his] hand." (*Id.* at 3:30–58.)

Detective Patrick Busch reviewed Nelson's police report of Harris's arrest and passed the report on to the prosecutor for charging. Harris subsequently spent 18 days in the Saginaw County Jail before being released on bond. A few weeks later, the state court dropped Harris's false felony report charge and dismissed the case after the witnesses, understood to be the store clerks, failed to appear.

Harris then filed suit against the City of Saginaw, the Officers, and Detective Busch. The parties filed cross-motions for summary judgment. The district court granted in part and denied in part the defendants' motion: denying qualified immunity to the Officers, granting qualified immunity to Detective Busch, and dismissing Harris's failure to train or supervise claim against the City. The district court denied Harris's motion in full.

On appeal, the Officers challenge the district court's denial of qualified immunity.  In his cross-appeal, Harris challenges the district court's grant of qualified immunity to Detective Busch and dismissal of his *Monell* claim against the City.

## II.  ANALYSIS

We review a district court's decision at the summary judgment stage de novo.  *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).  Summary judgment is inappropriate if the evidence presented reveals a genuine dispute of material fact, such that a reasonable jury could find in favor of the nonmoving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (citing Fed. R. Civ. P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The district court correctly emphasized the hat switch courts perform when evaluating cross motions for summary judgment:  In review of the *defendant's* motion, we accept the *plaintiff's* view of the facts as true and draw all reasonable inferences in favor of the *plaintiff*; in review of the *plaintiff's* motion, we accept the *defendant's* view of the facts as true and draw all reasonable inferences in favor of the *defendant*.  *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019).

### A.  Individual Officers

To prevail on his § 1983 claim against the Officers, Harris must show the Officers are not entitled to the affirmative defense of qualified immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 815, 818 (1982).  We evaluate qualified immunity in two, non-sequential steps:  whether "the facts alleged show the officer's conduct violated a constitutional right" and whether that right was "clearly established."  *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The individualization of the analysis is axiomatic to qualified immunity, as Harris must show that each defendant personally violated his rights.  *See Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014).

The Fourth Amendment protects individuals from unreasonable searches or seizures. *Gardenhire v. Schubert*, 205 F.3d 303, 312–13 (6th Cir. 2000).  Without ex ante authorization, a

search or seizure—such as an arrest—is unreasonable unless it falls under "a few specifically established and well-delineated exceptions." *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).   Here, the relevant exception is if the arresting officer had "probable cause to believe that an offense had been committed, was being committed, or was about to be committed[.]" *Est. of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999).

A probable cause determination must rest on "reasonably reliable information that the suspect has committed a crime," based on "the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence." *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (quoting *Gardenhire*, 205 F.3d at 318) (emphasis removed).   In retroactively considering whether probable cause existed, we look only to "the information possessed by the arresting officer at the time of the arrest." *Id.* at 501 (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)).

Individuals generally have the right to be free from arrest without probable cause. *Jones v. City of Elyria*, 947 F.3d 905, 914 (6th Cir. 2020); *Courtright v. City of Battlecreek*, 839 F.3d 513, 520 (6th Cir. 2016).   It has been the case "since at least the Supreme Court's decision in *Carroll v. United States*, 267 U.S. 132, 162 . . . (1925), that probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Dietrich*, 167 F.3d at 1012 (emphasis omitted).   And officers cannot ignore these facts and circumstances to insulate themselves:   It is clearly established that probable cause is lacking when officers effect "hasty, unsubstantiated arrests" without investigation. *Parsons*, 533 F.3d at 500–01.

Two critical questions remain.   First, did the Officers lack probable cause to arrest Harris?   And if so, were any or all of the defendants personally involved in Harris's arrest? "If a reasonable jury could answer 'yes' to both questions, this case must proceed to trial." *Gardenhire*, 205 F.3d at 313.

*1. Probable Cause*

To start, we determine whether a jury could conclude that a reasonable officer could have believed there was a "fair probability" that Harris had committed a crime. *United States v.*

*Sokolow*, 490 U.S. 1, 7 (1989).  As the Officers challenge the denial of their motion for summary judgment, we accept the facts in the light most favorable to Harris.  These facts, in that light, show that the Officers had decided to arrest Harris before conducting an investigation.

Officer Nelson, who made the decision to arrest Harris "based on his statements," called him a "f*cking liar" before he even spoke.  (Nelson Body Cam 1, R. 32, Ex. 8, at 0:32.)  And Officer LaDouce interrupted Harris's statement to ask if he "realize[d] how ridiculous" his story sounded, calling the story "bull sh*t" before going to speak with the clerks.  (*Id.* at 2:04–3:06, 5:17–20.)  In short, a jury could conclude that the Officers decided Harris was lying at the outset and made a "hasty, unsubstantiated arrest" accompanied only by what was, at most, a farce of an investigation.

The Officers generally assert that they had probable cause for Harris's arrest based on the clerk's statements, Harris's inconsistent stories, and the security footage.  But their assertions are belied by evidence that the Officers had seemingly made up their minds prior to speaking to the clerks, viewing the security footage, or hearing Harris's later clarifications.  A reasonable jury could conclude as much, finding that the Officers merely sought out whatever would support their decision after Harris's initial description.  In other words, a reasonable jury could conclude that Nelson and the other officers were "simply turn[ing] a blind eye toward potentially exculpatory evidence" in order to arrest Harris.  *Parsons*, 533 F.3d at 502 (quoting *Ahlers v. Schebil*, 188 F.3d 365, 371–72 (6th Cir. 1999)).

Take the Officers' limited review of security footage for example.  Seemingly based in part on their understanding that Harris alleged the clerk pulled on a gun on him at the front door, the Officers declined to review the potentially exculpatory security footage of the areas where Harris actually asserted the altercations happened:  (1) inside the store and (2) in the alley, near the van and back door.  Later, the Officers argued that "on surveillance, when the [clerk] gets to the [front] door, there is no gun in his hands" as evidence that Harris was lying about the alleged assault.  (Defs.' Mot. Summ. J., R. 32, PageID 151, 153.)  But the "surveillance" in question is only that of the front door, a place Harris did not say the clerk pulled the gun on him.  Such "surveillance," then, cannot be expected to confirm what happened inside the store or by the back door.

Additionally, Harris does not deny that the clerk first looked out the front door after he left.  Rather, Harris asserts the clerk pulled a gun on him after this—once Harris was already in the alley between Liquor Valley and Warwick Cleaners which, according to Harris, is around the corner after one exits the store's front door and directly outside the back door.  Whether the clerk proceeded to go out the back door after checking that Harris had left the front of the store would have presumably been confirmed by security footage of that area.  But in avoiding any potential confirmation of Harris's story, the Officers requested and viewed only footage of the front door.

The Officers were required to "consider the totality of the circumstances, recognizing both the inculpatory *and exculpatory* evidence, before determining if [they have] probable cause to make an arrest." *Gardenhire*, 205 F.3d at 318 (emphasis added) (citing *Dietrich*, 167 F.3d at 1012).  Nelson agreed that whether it was possible for an employee to have exited the back door would be relevant to the totality of the circumstances—the analysis required for probable cause.  But while Nelson told Harris that "[the clerk] never even came to this back," the only evidence supporting this statement is the clerk's own retelling of the interaction, as the Officers did not watch footage that may have revealed otherwise—the footage of inside the store or by the back door.

What is more, the Officers determined there was probable cause prior to the limited investigation of the back door, so this cannot be factored into their calculus.  Indeed, Lautner testified that he did not "know where out back what that [sic] means" and did not inquire into what "out back" meant on the scene. (Lautner Dep. Tr., R. 32, Ex. 13, PageID 280.)  Similarly, LaDouce responded "I don't recall" when asked if he went to the back door of the building. (LaDouce Dep. Tr., R. 32, Ex. 15, PageID 315.)  And Cece stated he did not go to the back door because he "couldn't get back there." (Cece Dep. Tr., R. 32, Ex. 14, PageID 300–01.)  But after Harris was arrested, Nelson directed Lautner and LaDouce to record the security footage they viewed earlier, during which they asked the clerk where the back door was, followed the clerk there, confirmed that this would be the "back door" that goes outside, walked up to the door, and pushed the back door open. (LaDouce Bodycam 3, R. 32, Ex. 7, 1:20–2:22.)  This question, then, could have been answered, but was not, because the Officers had already decided to arrest Harris before "investigating."

Separate from the security footage, the Officers also neglected to get a statement from Henderson, who was understood to have the closest-in-time fact recitation of the altercation, as he was the one who encouraged Harris to call 911.  In his deposition, Henderson provided multiple insights relevant to disputed questions of fact:  that Harris consistently said the clerk pulled a gun on him near the back door, that there was a white van near the store's back door, and that he saw the store clerks use the back door, such as to get to the dumpster, "on regular occasion." (Henderson Dep., R. 34, Ex. 8, PageID 505–07.)  Henderson even attempted to give a statement to that effect, but was told the Officers "d[id]n't want to hear no more of this stuff" because they thought Harris was "just lying" and wanted to "just take him to jail." (*Id.* at 506.)

In sum, when accepting the facts as alleged by Harris, he consistently told the Officers that the altercations happened inside the store and near its back door, the Officers were publicly dismissive of Harris and his story, and the Officers failed to review any of the readily available allegedly exculpatory evidence—notably, security footage of the areas where Harris alleged the altercation occurred.  Therefore, a reasonable juror could conclude that Harris's arrest was preordained from the moment the Officers took his statement, dissolving the Officers' argument for probable cause.  *See Parsons*, 533 F.3d at 500–01 (citing *Gardenhire*, 205 F.3d at 317).  For this reason, a reasonable juror could conclude that none of the Officers had probable cause to arrest him, which would be a violation of Harris's Fourth Amendment rights.  With such fact-specific questions at the heart of this inquiry, whether a reasonable officer would have believed they had probable cause to arrest Harris is better left for the jury.

### 2. Involvement in Arrest

Having established that Harris's retelling of his arrest depicts a violation of his clearly established constitutional right, we evaluate whether each officer was individually involved in the arrest.  An arrest is a "deprivation of liberty under the authority of law." *Manning v. Jarnigan*, 501 F.2d 408, 410 (6th Cir. 1974) (quoting *United States v. Baxter*, 361 F.2d 116, 118–19 (6th Cir. 1966)).  Both Nelson and Lautner were directly involved in the decision to arrest Harris.  Nelson claimed the arrest decision as her own, confirming that she had "discretion in this case as to whether [she] should arrest [] Harris or not," and indicating that the arrest was "based on his statements." (Nelson Dep. Tr., R. 32, Ex. 12, PageID 246, 259.)  Also, after seeing

video footage, she admitted that she "helped put the handcuffs on" Harris. (*Id.* at PageID 261.) Lautner affirmed the arrest decision, agreeing it was a "good arrest"—and one based on probable cause. (Lautner Dep. Tr., R. 32, Ex. 13, PageID 275.)

Although not involved in the arrest decision, Cece and LaDouce are equally liable because they both failed to intervene when they had reason to question whether probable cause existed and physically arrested Harris. There is no line in the liability sand separating subordinate officers who should have known probable cause did not exist from the decision-maker. *See Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) ("[O]fficers [following orders] . . . may be held liable under § 1983 if there is a reason why any of them should question the validity of that order."). We have gone as far as holding that "liability can attach to non-arresting officers[.] [T]he inquiry still turns on probable cause for the arrest itself." *Gardner v. Evans*, 920 F.3d 1038, 1064 (6th Cir. 2019) (citing *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). Indeed, Cece agreed that he had the authority to interrupt an arrest if he believed it to be unlawful.

Moreover, both Cece and LaDouce appeared to voluntarily—meaning, without direction from Nelson—assist with the arrest by both physically restraining and putting the handcuffs on Harris. And no party contends that LaDouce's liability for the arrest is changed by his trainee status. *See, e.g.*, *Hopper v. Montgomery Cnty. Sheriff*, 310 F. Supp. 3d 911, 920–21, 933 (S.D. Ohio 2017) (denying qualified immunity for a first-day deputy trainee). As such, all four Officers were personally involved in Harris's arrest. And because there is reason to believe that this arrest violated Harris's clearly established constitutional right, none of the Officers are entitled to qualified immunity.

The Officers' involvement is distinct from Detective Busch's post-hoc review of Nelson's police report. There is no evidence to suggest that Busch had knowledge beyond the police report, which included the Officers'—specifically, Nelson's—adopted justification for Harris's arrest. While there are reasons to question this perspective, those reasons are not applicable to Busch's review of the four corners of the report, which, if true as written, would have provided no reason for him to doubt that the Officers had probable cause. So, as Busch was not personally involved in the incident alleged to have resulted in a violation of Harris's

constitutional rights, qualified immunity is appropriate. *See Robertson*, 753 F.3d at 618 (citing *Gregory*, 444 F.3d at 758–59).

### 3. Mistake of Fact

The Officers assert that even if their arrest of Harris lacked probable cause, they are nonetheless protected by qualified immunity because the arrest was based on a reasonable mistake of fact—that they believed Harris originally described having a gun pulled on him near the front door. To them, Harris changed this story once in handcuffs when he later said the clerk pulled a gun on him near the back door. Paired with the store clerk's rejection of Harris's view of the facts, the Officers claim that such a change in story gave rise to probable cause that Harris had filed a false felony report. On this ground, the Officers assert that summary judgment in their favor is appropriate.

The Officers are correct that an arrest without probable cause due to a mistake of fact is not per se unreasonable. *Heien v. North Carolina*, 574 U.S. 54, 61 (2014) (quoting *Riley v. California,* 573 U.S. 373, 381 (2014)). But "[t]he limit is that 'the mistakes [of fact] must be those of reasonable men.'" *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). So, a warrantless arrest is constitutionally unreasonable if the mistake of fact relied on to justify the arrest was unreasonable.

Whether a reasonable officer would have interpreted Harris's accounts as inconsistent is a question of fact. In our circuit, if "there is some evidence—more than a mere scintilla of evidence—that [Harris], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause . . . , a genuine fact dispute is created." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009). And Harris and the Officers interpret Harris's initial description in conflicting ways. *See id.* at 914–15. Because the answer to this question is central to the qualified immunity analysis, the Officers put the cart before the horse by claiming qualified immunity on the grounds of a reasonable mistake of fact. The genuine dispute of material fact on this issue precludes summary judgment and warrants submission to a jury.

And even if the mistake were reasonable, the district court concluded that a reasonable jury could find that the Officers relied *only* on the store clerk's counterstatement in arresting Harris—a counterstatement separate and distinct from Harris's retellings. If accepted, whether that jury would find it reasonable to have mistaken Harris's stories as inconsistent would be irrelevant to the probable cause analysis. This question, then, may ultimately be unnecessary, as even a reasonable mistake would not save the Officers.

Combined with the probable cause analysis, then, genuine disputes of material fact remain regarding whether a reasonable officer could believe they had probable cause to arrest Harris and whether the Officers relied on a reasonable mistake of fact in arresting him. So, qualified immunity as to the Officers is inappropriate, and both parties' motions for summary should be denied. To the contrary, because Busch was not personally involved in Harris's arrest, he is entitled to qualified immunity.

**B. City of Saginaw**

While the City of Saginaw, as a local government, cannot shield itself from all liability by claiming qualified immunity, the City can shield itself from liability "under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In order to hold "the [City] as an entity . . . responsible," Harris needs to show that "execution of a government's policy or custom . . . inflict[ed] the injury." *Id.* Here, Harris asserts that the City of Saginaw maintains a policy or custom of inadequate training and supervision on probable cause determinations for constitutional arrests. *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).

Harris correctly notes that such an insufficient policy or custom need not be formally approved or implemented, provided that the failure to train or supervise "evidences a deliberate indifference to the rights of" individuals within that city. *See Canton*, 489 U.S. at 389. A city's "deliberate indifference" may arise by (1) failing to respond to "repeated complaints of constitutional violations by its officers," or (2) failing to respond to a single constitutional violation such that the training's inadequacy was "so obvious, and . . . so likely to result in the

violation[.]"  *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (citations omitted).  But neither of these arise here.  Indeed, Harris does not assert the former, so this analysis focuses only on the latter:  single-incident liability.

### 1. Failure to Train

"The failure to provide any training on probable cause determinations . . . is constitutionally inadequate."  *Ouza*, 969 F.3d at 289.  The City's police chief swore that all officers "are trained on the Fourth Amendment and the probable cause standard."  (Robert Ruth Aff., R. 43, Ex. 2, PageID 884.)  Distinct from providing evidence to the contrary, Harris attempted to undermine the sufficiency of training by testing the Officers' knowledge of the Fourth Amendment and questioning the Officers' understanding of the basis for Harris's arrest. In so doing, Harris attributes the individual Officers' inability to recall any Fourth Amendment training or recite what the Fourth Amendment "stands for" to the City's purportedly "nonexistent training" on the applicable arrest standards.

This claim is unsuccessful for two related reasons.  First, failure to train is not measured by information retention or whether "better or more training" would have avoided the incident. Failure to train is measured by inquiring if the City "completely disregarded" its duty to train its officers on probable cause determinations.  *See Canton*, 489 U.S. at 390–91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). And here, the record contains undisputed evidence of training per the police chief.  (*See* Robert Ruth Aff., R. 43, Ex. 2, PageID 884.)  What is more, when asked in a different manner—not being asked what the Fourth Amendment stands for in general—one of the Officers correctly articulated the probable cause standard and the appropriate considerations when evaluating the evidence. (*See* Nelson Dep. Tr., R. 32, Ex. 12, PageID 233–34.)

Second, we must bear in mind that we are addressing competing motions for summary judgment.  As to Harris's motion, we interpret the facts in the light most favorable to the City. The City said they train on probable cause, which Harris did not rebut, instead focusing on potential gaps in training related to the Fourth Amendment more generally.  And as to the City's

motion, even construing the record in Harris's favor, no reasonable juror could find the City "*complete[ly]* fail[ed] to provide *any* type of [probable cause] training" in light of the police chief's unchallenged testimony. *Ouza*, 969 F.3d at 289 (emphasis added).

Harris also takes issue with the City's policy memo regarding Michigan state law governing warrantless arrests. But substance of the memo aside and accepting Harris's view of its flaws, the memo alone is not in the "narrow range of circumstances" that establishes single-incident failure-to-train liability. *See Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015). This narrow range of circumstances includes situations where a constitutional violation is "the 'obvious' consequence of failing to provide specific [] training, and that this showing of 'obviousness' [] substitute[s] for the pattern of violations ordinarily necessary[.]" *Connick v. Thompson*, 563 U.S. 51, 63 (2011). But where it is understood that an actor receives *some* training on the constitutional subject matter—even training outside the workplace—that actor "does not present the same 'highly predictable' constitutional danger." *See id.* at 64–67. As in *Connick*, "[w]e do not assume that [on-scene officers] will always make correct [probable cause] decisions[.] But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Id.* at 68.

### 2. Failure to Supervise

We conduct a similar analysis for the City's potential liability for failure to supervise, which also turns on whether the City exhibited deliberate indifference to its citizens' constitutional rights. *See Shadrick*, 805 F.3d at 736–741 (citing *Canton*, 498 U.S. at 379, 390–91). We have found the failure to supervise when all of the relevant parties disclaimed responsibility. For example, in a case concerning potential Eighth Amendment violations resulting from lack of specific medical training in a correctional facility, neither the nurses' two supervisors, the facility's medical director, nor the medical services corporation's administrator claimed responsibility for training or supervising the nurses providing direct care. *Id.* at 741. Nor could they confirm who was responsible for such training, that such training occurred at all, or that the nurses were following such training. *Id.*

Here, it is not the case that the Officers lacked supervision.  The City identifies the known supervisors—the police chief and lieutenant.  Instead, Harris mistakenly attributed supervisory responsibilities to the wrong person:  Detective Busch.  And as discussed above, Busch did not personally arrest Harris and his involvement occurred only after the arrest had been effectuated.  So, Harris is unable to establish City liability for failure to supervise the Officers.

Because neither the failure to train nor failure to supervise analysis reveals any genuine disputes of material fact, Harris's motion as to these claims should be denied and the City's should be granted.

## III.  CONCLUSION

For the foregoing reasons, we affirm.