NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0215n.06

No. 23-5214

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ROY STUCKER; COURTNEY BROWN-PORTER, on behalf of herself and as guardian and next friend of her minor child, S.W.,

      Plaintiffs - Appellants,

v.

LOUISVILLE METRO GOVERNMENT oka Louisville-Jefferson County Metro Government; WESLEY TROUTMAN,

      Defendants - Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

OPINION

Before: WHITE, STRANCH, and NALBANDIAN, Circuit Judges.

      STRANCH, J., delivered the opinion of the court in which WHITE and NALBANDIAN, JJ., concurred. NALBANDIAN, J. (pp. 28–34), delivered a separate concurring opinion addressing Part II.B.2. of the majority opinion.

      **JANE B. STRANCH, Circuit Judge.** Roy Stucker, Courtney Brown-Porter, and her 10-year-old daughter (the Stuckers or Family) brought this 28 U.S.C. § 1983 case for violation of their Fourth Amendment right against unreasonable searches and seizures. The Family was engaged in their third day of employment painting the interior of a vacant house when the Louisville Metro Police Department (LMPD) executed a search warrant on the property. The LMPD arrived in two armored vehicles and at least one ATV, and within seconds of shouting out a demand to exit, shattered then shot through a window. Despite the Family's cries and Porter's response, "Please, this is just a job, we don't live here," the officers shattered another window. The Family came out

and the officers separated and handcuffed Stucker, Brown-Porter, and her young daughter. The district court dismissed the claims against one officer based on the statute of limitations and granted summary judgment on the *Monell* claim. The Stuckers timely appeal both rulings. For the reasons stated below, we **AFFIRM IN PART**, **REVERSE IN PART, VACATE IN PART,** and **REMAND** the case to the district court for further proceedings in accordance with this opinion.

## I.   BACKGROUND

### A.   Factual Background

On July 15, 2019, after months of investigating the suspected drug crimes of an individual named Joshua Kirk, Officer Troutman of LMPD obtained a warrant to search 142 West Amherst Avenue in Louisville, Kentucky (the Residence). Officer Troutman supported the warrant with an affidavit detailing an ongoing drug investigation into Kirk, including information about Kirk's use of multiple locations to carry out those crimes.

Of the 13 instances of surveillance and controlled buys listed by Troutman to support the warrant, the affidavit noted only two in which Kirk was in or around the Residence, describing the first as a controlled buy executed "[d]uring the week of 6/7/2019." R. 14-4, Warrant Aff., PageID 222. The affidavit stated that after receiving a call from a confidential informant seeking drugs, Kirk "travelled to [the Residence]" in one vehicle, went inside, then left in a different vehicle driven by another person. *Id.* at PageID 223. A short time later, Kirk returned to the Residence but did not go inside it. Kirk got in his original vehicle and drove to another location where he sold drugs to the confidential informant.

Troutman listed the second incident at the Residence as a controlled buy "[d]uring the week of 6/25/2019." R. 14-4, Warrant Aff., PageID 223. Kirk was seen approaching the Residence, but

the affidavit does not state whether he entered the Residence, only that he was there a short time before driving to the controlled buy. Approximately twenty days passed between this instance and the warrant's execution.

On July 5, ten days before LMPD obtained the warrant to search the Residence, LMPD assisted in a search of the Residence in relation to a different drug-related matter. That search yielded no evidence of narcotics dealing but did find several large bags of marijuana tablets and pills on the person of one of the house's residents. After the July 5 search of the Residence, all its occupants moved out. The Residence "had been empty and removed of furniture for many days before July 15, 2019, including furniture being outside on the curb." R. 1-3, PageID 9, ¶ 15. Three days before the July 15 execution of the search warrant, the Stuckers began painting the Residence for the next tenant.

Hours before the Residence was searched on July 15, Kirk—the subject of Troutman's investigation—was taken into custody. Troutman was not present at the Residence when the warrant was executed. Bodycam footage from the execution of the warrant shows that two armored vehicles and at least one ATV arrived at the Residence. Officers approached from the side of the house, which had newspaper covering its windows, knocked, and yelled, "police with a warrant," and seconds later, an officer shattered a front window of the house. Brown-Porter and her ten-year-old daughter screamed, and officers shot into the broken window over their outcries. In response to further orders to exit through the front door, Brown-Porter yelled, "Please, this is just a job, we don't live here." The Family began pleading with officers, who then shattered another window. One officer said, "They're terrified."

Upon exiting the Residence, Stucker told officers that he and Brown-Porter were there to paint the house. Stucker asked, "Why was that necessary?" as Brown-Porter exclaimed, "You're

really going to put handcuffs on my daughter?" Stucker told the officers, "We've been here for three days painting." Officers proceeded to handcuff and separate all three. A search of the mostly empty home yielded no evidence of any criminal activity. Officers joked after discussing their fruitless search that it revealed "the old setting up the painters trick."

### B.      Procedural Background

On July 14, 2020, Stucker and Brown-Porter filed an initial complaint against LMPD, Unknown Officers, and an Unknown Detective under 28 U.S.C. § 1983 for violation of their Fourth Amendment right against unreasonable searches and seizures. They alleged that LMPD's policy or custom of tolerance of constitutional violations was directly responsible for the harm caused by LMPD's search. The Stuckers did not name the detective in their initial complaint because the Jefferson County District Court, upon the motion of Defendants, had sealed the affidavit in which Troutman's name appeared. The Stuckers had previously made open records requests to LMPD for the warrant and affidavit but were told that the relevant records had been sealed by court order. On September 14, 2020, the Stuckers moved to unseal the warrant and affidavit, which was granted and revealed that Troutman authored the affidavit, and that Kirk was the subject of the investigation. On November 18, Plaintiffs substituted Troutman for "Unknown Detective" in an amended complaint (hereinafter "Complaint"). The case was then removed to federal court on December 3, and Troutman was served with the Complaint on February 15, 2021.

Upon Troutman's motion, the district court dismissed the claims against him on the basis that Troutman had been added after the one-year statute of limitations period elapsed. LMPD subsequently moved for summary judgment on Plaintiffs' *Monell* claim. The court granted LMPD's motion, concluding that the warrant was supported by probable cause, was not stale, and

that Plaintiffs could not establish a pattern or practice of behavior by LMPD that caused a constitutional violation.

The Stuckers appeal the dismissal of the claims against Troutman and the grant of summary judgment to LMPD on the *Monell* claim. Their Reply Brief asks this court to take judicial notice of the Department of Justice's 2023 Report (the DOJ Report) on its investigation of LMPD.[1] LMPD's motion to strike references to the DOJ Report was denied.

## II.    ANALYSIS

### A.        The Claims Against Troutman

Kentucky's one-year statute of limitations for personal injuries applies to this action. *See Hughes v. Vanderbilt University*, 215 F.3d 543, 547 (6th Cir. 2000); Ky. Rev. Stat. § 413.140(1)(a). LMPD was named in the original complaint filed on July 14, 2020 within the one-year period, but because the affidavit and warrant were sealed, Troutman was first named in the Complaint filed on November 18, 2020—over a year after the Family's injuries on July 15, 2019—and Troutman was served the following February. The district court dismissed the § 1983 and state law false-imprisonment claims against Troutman on the grounds that the one-year statute of limitations barred both claims. The Stuckers argue that the statute of limitations was tolled by LMPD's concealment of Troutman's identity or, in the alternative, that the Complaint relates back to the original complaint under Federal Rule of Civil Procedure 15(c)(3).[2]

---

[1] *See* United States DOJ, Civil Rights Div., *Investigation of the Louisville Metro Police Dep't & Louisville Metro Gov't*, (March 8, 2023), https://www.justice.gov/file/1573021/download.

[2] As noted below, the district court applied the federal Rule, rather than Kentucky's Rule, in error. *See Pac. Employers Ins. Co. v. Sav-a-Lot of Winchester*, 291 F.3d 392, 400-01 (6th Cir. 2002).

      1.      <u>Concealment Tolling the Statute of Limitations</u>

The Stuckers argue that the statute of limitations as to Troutman was tolled by LMPD's concealment of the warrant and affidavit. "Deliberate concealment by a defendant of the plaintiff's cause of action will toll the statute of limitations." *Lashlee v. Sumner*, 570 F.2d 107, 110 (6th Cir. 1978). The concealment alleged here was LMPD's "refusal" to provide the warrant and affidavit in response to Plaintiffs' open records requests. We begin with our precedent.

*Brown v. Cuyahoga County* held that Brown's failure to obtain jail records requested from county officials did not trigger equitable tolling because "Brown likely could have obtained these records within the limitation period through discovery if he had been more diligent in filing his suit." 517 F. App'x 431, 435 (6th Cir. 2013). Although *Brown* did not on its face concern concealment, Brown argued that he should have been allowed to amend because "County officials wrongfully denied requests for access to jail records prior to the filing of this suit and the expiration of the limitations period." *Id.* at 434. We denied relief on his claim that the wrongful refusal prevented him from "su[ing] the appropriate parties within the limitations period." *Id.*

In *Lashlee*, by contrast, we reversed the district court's summary judgment order denying tolling based on that court's conclusion that a report of Lashlee's testing "was available to him through the defendant," a finding that lacked any "support in the record." 570 F.2d at 110, 111. Because Lashlee's affidavit and the defendant's interrogatory answers were inconsistent on the matter of deliberate concealment, we held that genuine disputes of fact existed regarding "whether the defendant did intentionally conceal the report," and "whether the plaintiff . . . exercised due diligence." *Id.* at 111. We thus reversed the district court's grant of summary judgment, stating that its denial of tolling was "premature at least." *Id.*

Unlike *Lashlee*, where the district court had to go beyond the record, the facts concerning the Family's open records requests and LMPD's responses are not disputed. Counsel twice made open records requests for the search warrant and affidavit, but LMPD responded that the documents were under seal by court order, and that the court is the custodian of those records. LMPD did not refuse to disclose records it held; instead, it directed the Family's counsel to the appropriate custodian of the records. Counsel did not move the state court to unseal the documents until September 14, 2020, however, well after the case began and the statute of limitations had run. Given that the state court granted the request the same day, the Stuckers "could have obtained these records" through discovery and added Troutman's name to the Complaint "within the limitation period" if they "had been more diligent" in making a timely unsealing request. *Brown*, 517 F. App'x at 435. Based on our holding in *Brown*, the fact that a party tries to retrieve records from the wrong state officials and is unsuccessful does not toll the statute of limitations. The record here does not support deliberate concealment.

### 2.      Relation Back to the Original Complaint

Plaintiffs argue in the alternative that the Complaint's claims against Troutman relate back to the date of the original pleading and raise largely the same allegations against Troutman—§ 1983 and false imprisonment claims—as it did against the "Unknown Detective." As both parties recognize on appeal, the district court erred in applying federal rules and caselaw to this issue. State law applies because the Complaint was filed in state court. *Pac. Employers Ins. Co. v. Save-a-Lot of Winchester*, 291 F.3d 392, 400-01 (6th Cir. 2002). Kentucky Rule of Civil Procedure 15.03 governs the relation back of pleadings. The Rule states:

> (1) Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

> (2) An amendment changing the party against whom a claim is asserted relates back if the condition of paragraph (1) is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (a) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (b) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

Ky. R. Civ. P. 15.03.

The Rule's first requirement is that the amendment stems from the same "conduct, transaction, or occurrence" set forth in the original complaint. Plaintiffs' claims against Troutman were the same as those against "Unknown Detective" and related to the same search warrant. The first requirement is satisfied.

Rule 15.03's second requirement is that the new party had notice of the suit within the statute of limitations and "knew or should have known" within the statute of limitations "that, but for a mistake concerning the identity of the proper party, the action would have been brought against him." *Id.* "[N]otice to an intended defendant may be imputed from notice to a named defendant when the two share an 'ongoing business relationship.'" *Halderman v. Sanderson Forklifts Co.*, 818 S.W.2d 270, 273 (Ky. Ct. App. 1991) (quoting *Funk v. Wagner Mach.*, 710 S.W.2d 860, 862 (Ky. Ct. App. 1986)). The Kentucky Court of Appeals has found that two parties have an ongoing business relationship where they share responsibility for an alleged tort, their relevant business interests are "identical," and they are represented by the same counsel. *See Clark v. Young*, 692 S.W.2d 285, 288-89 (Ky. Ct. App. 1985). Here, Troutman and LMPD have a sufficiently shared business interest—Troutman was employed by LMPD—and are represented by the same counsel on the same claims. Notice is thus imputed to Troutman.

The final requirement for relation back is whether Troutman knew or should have known that the action would have been brought against him but for a mistake concerning the identity of

the proper party. Kentucky law requires a strict construction of statutes "where the language of a statute is clear and unambiguous on its face," and "we are not free to construe it otherwise even though such construction might be more in keeping with the statute's apparent purpose." *MPM Fin. Grp., Inc. v. Morton*, 289 S.W.3d 193, 197 (Ky. 2009) (citing *Whittaker v. McClure*, 891 S.W.2d 80, 83 (Ky. 1995)). As the Kentucky appellate courts have recognized, because "a lack of knowledge of [a defendant's] potential liability" is different from the "misnomer or misidentification" needed for a "mistake" to exist, "[f]or purposes of CR 15.03(2)(b), ignorance does not equate to" mistake. *Phelps v. Wehr Constructors, Inc.*, 168 S.W.3d 395, 398 (Ky. Ct. App. 2004). Here, given the plain meaning of "mistake" and the Kentucky courts' construction of that language, the Complaint does not relate back to the original filing because no mistake within the meaning of the relevant rule occurred. The claims against Troutman were properly dismissed.

### B. *Monell* Claim

The Stuckers raised a *Monell* claim against LMPD under § 1983, which the district court disposed of on summary judgment. *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). "This court reviews de novo a district court's decision to grant summary judgment." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing the district court's decision to grant summary judgment, we view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Cockrel*, 270 F.3d at 1048.

Under *Monell* and its progeny, a plaintiff may hold a municipality responsible for a "policy or custom" that inflicts a constitutional injury. *Monell*, 436 U.S. at 694; *see Graham ex rel. Estate*

of *Graham v. Cnty. Of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004).  To prove a *Monell* claim,

plaintiffs must show that a government official violated their constitutional rights and that a

municipal policy or custom is responsible for that violation. *See Monell*, 436 U.S. at 694.

We begin with legal requirements specific to *Monell* claims.  Governing Supreme Court

precedent holds that where the specified officer is found to be constitutionally blameless, a *Monell*

claim will fail.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  We have indicated that

municipalities may nevertheless "be held liable under § 1983 in certain cases where no individual

liability is shown."  *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018). As we have

generally noted:

> Our Circuit has previously determined a defendant municipality's *Monell* liability
> by evaluating only a non-party's actions, suggesting that a party's liability is not
> required, as long as the court finds a constitutional violation occurred. *Andrews v.
> Wayne Cnty.*, 957 F.3d 714, 725 (6th Cir. 2020); *see also Garner v. Memphis Police
> Dep't*, 8 F.3d 358, 365 (6th Cir. 1993) (rejecting City's argument that because the
> only defendant officer in the case had been dismissed by the district court, the City
> should also be dismissed).

*Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804, at *4 (6th Cir. Aug. 9, 2023).

Our sister circuits have expressly and widely held that a municipality may be liable for

constitutional violations even absent a successful claim against an offending officer if the outcome

is not inconsistent with *Monell*'s holding. *See, e.g., Askins v. Doe*, 727 F.3d 248, 253 (2d Cir.

2013) ("It suffices to plead and prove against the municipality that municipal actors committed the

tort against the plaintiff and that the tort resulted from a policy or custom of the municipality.  In

fact, the plaintiff need not sue the individual tortfeasors at all, but may proceed solely against the

municipality."); *Mervilus v. Union Cnty.*, 73 F.4th 185, 197 (3d. Cir. 2023) (holding that it was

consistent for the jury to find the officer not liable due to an absence of bad faith while still finding

the municipality liable for a constitutional violation under *Monell*); *Thomas v. Cook Cnty. Sheriff's*

*Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict."); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."); *Gibson v. Cnty. of Washoe,* 290 F.3d 1175, 1186 n.7 (9th Cir. 2002) ("[A] municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred."); *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985) ("*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable."); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) ("*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government.").

Monell* requires a constitutional injury, not the joinder of an officer acting unconstitutionally. *Monell*, 436 U.S. at 694. *Monell* holds that § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Id.* at 692. Given the language of *Monell*, *Colemon*, and other circuit precedent, a *Monell* claim against a municipality may proceed without a claim against the offending officer, so long as it remains consistent with finding a constitutional violation. The district court's ruling here did not absolve Troutman of constitutional wrongdoing; it merely dismissed the claims against him based on the statute of limitations. Thus, recovery can be had against LMPD in Troutman's absence, provided Plaintiffs can prove a constitutional violation caused by LMPD's policy or customs. *Id.*

1.  Constitutional Violation—Fourth Amendment

To satisfy *Monell*'s requirement of a constitutional violation, the Stuckers argue that LMPD violated their Fourth Amendment protection "against unreasonable searches and seizures." U.S. Const. amend. IV. They specifically claim that LMPD's warrant lacked probable cause. "The probable cause standard is a 'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life.'" *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "The government bears the burden of showing probable cause in connection with a search warrant." *United States v. Abboud*, 438 F.3d 554, 569 (6th Cir. 2006).

"A warrant must be supported by 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*.'" *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) (quoting *Sgro v. United States*, 287 U.S. 206, 210 (1932)). LMPD argues that probable cause for the warrant was demonstrated in Troutman's affidavit. "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *Frazier*, 423 F.3d at 531 (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). We review de novo the probable cause analysis considering both adequate nexus and staleness in determining whether the government met its burden as to the warrant. *See United States v. Lawhorn*, 467 F. App'x 493, 495 (6th Cir. 2012) (noting that challenges to the existence of probable cause, including the issue of staleness, are questions of law).

a.  Adequate Nexus

To justify a search, a warrant must demonstrate a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)

(quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)). It is only by showing an adequate nexus that a warrant can establish a "fair probability" that the sought-after evidence will be found at a "particular place." *Gates*, 462 U.S. at 238. A warrant will fail this requirement if it does not "set forth sufficient facts that incriminating evidence would be found *there*, rather than in some other place." *Carpenter*, 360 F.3d at 594. Probable cause cannot be found based on a warrant with information that is "too vague, generalized, and insubstantial." *Id.* at 595.

For probable cause, a warrant must make "*some* connection" between the place to be searched and the alleged illegal activity. *United States v. Christian*, 925 F.3d 305, 313 (6th Cir. 2019) (quoting *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017)). We have held that an adequate nexus was absent from warrants where police observed marijuana plants growing near a residence connected to the plants by a beaten path, *Carpenter*, 360 F.3d at 593, and where an affidavit contained only the assertion that an address was the residence of a subject arrested with cocaine on his person, *United States v. McPhearson*, 469 F.3d 518, 524-25 (6th Cir. 2006). Likewise, in *United States v. Brown*, probable cause did not exist to search a residence at which a "known drug dealer['s]" car was parked when the car tested positive for narcotics. 828 F.3d 375, 383-84 (6th Cir. 2016). In sum, "we have required some reliable evidence connecting the known drug dealer's ongoing criminal activity *to the residence*; that is, we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id.* at 383 (emphasis added).

In *United States v. Hines*, we reversed the district court's finding that a warrant lacked probable based on "a circle of speculation" regarding information from two confidential informants. 885 F.3d 919, 924 (6th Cir. 2018). There, both informants provided dates on which

they saw or purchased drugs at the house, the nature of their communications for purchases, and their history of purchasing drugs from the subject of the investigations. *Id.*. *Hines* held that "even though the affidavit did not address in detail the reliability of" the informants, their specific information tying the particular location to drug sales and storage established probable cause. *Id.* at 924-25.

The affidavit to search this house did not contain straightforward "facts showing that the residence had been used in drug trafficking." *Brown*, 828 F.3d at 383. Instead, the affidavit relied on a tapestry of evidence that all together showed that Kirk was involved in selling drugs across various locations. But probable cause to arrest Kirk is not the issue here—at issue is the affidavit's support to search the Residence itself. Troutman's affidavit listed only two instances of Kirk's presence at the Residence. In neither instance was Kirk seen with "drug paraphernalia" at the Residence, nor was Kirk seen conducting a drug deal there. And the affidavit contains no allegation that the confidential informant alleged any information regarding drugs at or around the Residence. In fact, for one of the visits, the affidavit never conclusively stated that Kirk actually entered the Residence. On the other visit, moreover, although Kirk entered the Residence before a controlled buy, he was also seen getting into another car with a second person, driving away, returning to his car parked outside the Residence, and *then* driving to the controlled buy. In both instances, the nexus connecting the Residence to wrongdoing is attenuated.

Mere presence at or near a place, absent evidence tying *that place* to wrongful conduct, is insufficient under *Brown*. *See Christian*, 925 F.3d at 313. Given the attenuated nature of the evidence described above tying the Residence to criminal wrongdoing, the Government did not satisfy its burden to establish the "adequate nexus" necessary for probable cause.

> ### b.     Stale Warrant

We also review the warrant to determine if it lacked probable cause due to staleness. Whether a warrant is stale depends on the specific nature of the crime being investigated and the "circumstances of each case." *Sgro*, 287 U.S. at 210-11. As a result, we have not defined firm time limits for staleness. *See Abboud*, 438 F.3d at 572. Instead, four factors are used to determine whether the information supporting the warrant was sufficiently fresh:

> (1) "the character of the crime (chance encounter in the night or regenerating conspiracy?)" (2) "the criminal (nomadic or entrenched?)" (3) "the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?)" (4) "the place to be searched (mere criminal forum of convenience or secure operational base?)."

*Id.* at 572-73 (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). Although courts balance these four factors to determine how fresh or stale information in a warrant is, "[i]n the end, a warrant will be upheld if there was a "'substantial basis for . . . conclud[ing]" that a search would uncover evidence of wrongdoing.'" *Spikes*, 158 F.3d at 923 *(*quoting *United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir.1993)).

Twenty days separated the last investigation report about the Residence from the warrant's execution. That relatively short length of time, "while clearly salient, is not controlling." *Id.* The district court found that the four factors split evenly between favoring Plaintiffs and LMPD (in favor of Plaintiffs on the second and third factors, and for LMPD on the first and fourth factors). The court also noted that the time that elapsed from the last investigation and the warrant's execution was within a timeframe that courts have generally found close enough to support a warrant. *See United States v. Perry*, 864 F.3d 412, 415 (6th Cir. 2017) ("[E]vidence of drug sales two to fifty-one days before [the probable cause determination] is recent enough here to suggest

that there may be further evidence of illegality in that place."). We agree with the district court as to the first three staleness factors and focus our analysis on the fourth.

The district court found that the fourth factor weighed against staleness on the basis that the affidavit indicated Kirk treated the residence as a hub. But governing precedent requires consideration of LMPD's total knowledge about the Residence before and after the magistrate issued the warrant. That is because the probable cause required by the Fourth Amendment "may cease to exist after a warrant is issued," because the "police may learn, for instance, that contraband is no longer located at the place to be searched." *United States v. Grubbs*, 547 U.S. 90, 95 n.2 (2006). If "an initial fruitless consent search dissipates the probable cause that justified a warrant," for example, "new indicia of probable cause must exist to repeat a search of the same premises pursuant to the warrant" because "probable cause must exist at both points in time." *United States v. Bowling*, 900 F.2d 926, 932 (6th Cir. 1990).

Here, ten days before the execution of the challenged search warrant, LMPD officers assisted a separate search of the Residence for drugs and found no methamphetamine or heroin, only marijuana and a small amount of pain medication. So, the LMPD search of the Residence ten days before executing the search warrant at issue here did not find evidence of the kind of crimes specified in the affidavit. This represented fresh evidence that the Residence was not operating as a "base" for narcotics dealing.

In his deposition, Troutman claimed that evidence of drug activity from other locations "freshened up" the information related to the Residence. But this Residence was never referenced in subsequent investigation notes. It is true that stale evidence may be freshened by evidence of ongoing criminal activity. *See United States v. Henson*, 848 F.2d 1374, 1381-82 (6th Cir. 1988). That evidence, however, must pertain to ongoing criminal activity involving *the place to be*

*searched*. *Spikes*, 158 F.3d at 924 (holding that recent evidence of a crack cocaine operation at a specific location freshened otherwise stale information related to the location from years prior).

LMPD then argues that evidence of Kirk's continued drug dealing in and of itself, without reference to the Residence, freshens the otherwise stale information. That claim is inconsistent with our precedent and with the elements of the staleness test, which consider the transient nature of the alleged criminal and the movability of the enterprise. If evidence of a continuing scheme unconnected to a specific location was all that was needed to support probable cause to search a specific location, then transience and moveability would not matter. The components of the staleness test, however, dictate that whether the criminal is nomadic or entrenched and whether the place to be searched is a mere convenience or a set operational base are elements that govern the staleness analysis of a warrant. Because the newer information on Kirk's drug dealings in the affidavit did not relate to the Residence, it provides evidence that Kirk was more transient, not that the Residence had been or remained a hub. *See Abboud*, 438 F.3d at 572. A continued investigation of a drug dealer without connection to the place to be searched does not authorize officers to search the places a suspected criminal had previously visited.

Drawing reasonable inferences in Plaintiffs' favor, *see Cockrel*, 270 F.3d at 1048, the fourth factor, like the second and third, weighs in favor of staleness. Considering all four factors together, the warrant's information was stale and thus the warrant lacked probable cause. We now turn to the second component of Plaintiffs' *Monell* claim against Louisville's Police Department.

### 2. Municipal Responsibility

"*Monell* is a case about responsibility." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). To hold a municipality responsible for a constitutional violation, a plaintiff must show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury

alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (quoting *Monell*, 436 U.S. at 694). To satisfy *Monell*'s "requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)). The policies at issue need not be written down; they may instead be commonly accepted practices of the city organization. *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (citing *Pembaur*, 475 U.S. at 480-81).

There are four theories of municipal responsibility: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson*, 925 F.3d at 828 (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Plaintiffs pursue the third and fourth of these theories by arguing that LMPD had both a policy of inadequate training and a custom of tolerance of, or acquiescence in, issuing invalid warrants.

"To succeed on [an inadequate training] claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020) (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To prove a policy or custom of acquiescence, a party must show

(1) the existence of a clear and persistent pattern of [wrongdoing];
(2) notice or constructive notice on the part of the [municipal body];

> (3) the [municipal body]'s tacit approval of the unconstitutional conduct, such that
> their deliberate indifference in their failure to act can be said to amount to an official
> policy of inaction; and
>
> (4) that the [municipal body]'s custom was the "moving force" or direct causal link
> in the constitutional deprivation.

*Doe v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996).

Notably, although the two theories (inadequate training and acquiescence) differ in some ways,

they both require deliberate indifference and causation. With that in mind, and to limit

redundancies in our review, we turn to the evidence in the record.

### a.        Evidence in the Record

To show municipal responsibility, Plaintiffs introduced evidence from a report and from

the LMPD and its agents.  First, we address the Heintze Report, an "Independent and Objective

Assessment of [LMPD's] Policies, Practices, and Procedures" performed at the request of the

LMPD and published in January of 2021. R. 35-11, Heinze Rep., PageID 635.  The Heintze Report

highlighted LMPD's warrant training, and determined that LMPD "does not always follow" the

formal "policies and protocols" in place for drafting warrants, resulting in "operational practices"

that deviate from written protocols. *Id.* at PageID 636.  This is because "LMPD has not delivered

training that supports the policies to the entire Department.  For example, although the LMPD

developed a search warrant training course for detectives, new detectives do not necessarily go

through this training block before being tasked to develop an affidavit and execute a search

warrant." *Id.* The Heintze investigation, largely based on interviews with officers serving in

LMPD, revealed the following insufficiencies in practice:

- "[S]upervisors seldom queried officers regarding the underlying facts and circumstances
  necessary to demonstrate probable cause."

- "Supervisory review was minimal," and "[s]upervisors generally approved affidavits immediately after an officer presented their affidavit without performing an in-depth review[.]"
- "LMPD has not formalized the use of a critical incident review" to go over issues in warrant executions.

*Id.* The Report concluded that these factors contribute to a "culture of acceptance" of impropriety in LMPD by ignoring procedures in place to ensure constitutional compliance. *Id.*

The record also contains evidence from the LMPD and its agents, including training materials, interrogatories, and deposition testimony from Troutman and other leaders at LMPD. This evidence demonstrates that in 2018 and 2019, only 55 of LMPD's 961 members, or 5.72%, took the Department's optional search warrant seminar. R. 35-10, Interrogatories, PageID 634. LMPD's only mandated warrant training as of 2019 was during the initial academy training of officers. Finally, the record includes a complaint filed against LMPD and its agents in which, almost a year before the warrant at issue here was executed, LMPD's same failures in training resulted in the execution of a search warrant that lacked probable cause for many of the same reasons as the warrant here. *Burr v. Louisville Metro Gov't*, Civ. A. No. 3:19-cv-790 (W.D. Ky., filed October 31, 2019).

Troutman testified that to his recollection, the last time he received any formal training on warrants and probable cause was over six years before the incident at the Residence.[3] And yet, when Troutman was asked about the decisions he made or actions he took that led to the execution

---

[3] In his deposition, Troutman describes other trainings he has received, including one in January of 2021 and "two other trainings" that he has taken in which he recalled "drafting . . . a dummy search warrant," but did not recall "how long the portion of" that training about warrants was. R. 29-3, PageID 331. He does not state the dates of these alleged trainings, but discusses them alongside the training he received in January 2021, subsequent to the facts underlying this case. Troutman's training records do not include any indication that his trainings prior to 2019 involved warrants or probable cause. Because we must look at the evidence in a light most favorable to the Stuckers, we cannot conclude that these "trainings"—which may have contained "at least some discussion of search warrants"— are probative as to the relevant theories of municipal liability.

of the warrant—including decisions that we have found unconstitutional—he repeatedly justified them based on his "training." Regarding LMPD's policies for warrant execution, Troutman testified that he did not know whether trying to determine who lives in a house was part of LMPD's policy for obtaining a warrant on the residence, precisely who and how many people are required to review warrants, or what LMPD's policy was regarding using Special Weapons and Tactics (SWAT) when entering a residence during warrant executions. Troutman did not know if anyone other than his immediate supervisor ever reviewed his warrants. And although Troutman attended additional Basic Narcotics Investigators training provided by the DEA in 2017, he stated "I don't know that there was a specific search warrant portion . . . I don't know. . . . Sorry." Despite his lack of understanding and training regarding LMPD policies and practices governing the issuance of warrants, supervisors at LMPD tout Troutman as one of the best officers at writing and issuing warrants.

In light of this record, we turn to the two theories of municipal responsibility upon which the Stuckers rely: first, inadequate training; and second, acquiescence to unconstitutional conduct. As noted above, a claim for inadequate training requires showing an inadequate training program, deliberate indifference, and that the inadequacy caused or was closely related to the constitutional violation. *See Ouza*, 969 F.3d at 286-87.[4] The evidence outlined above goes directly to those elements. The Heintze Report and Troutman's deposition testimony both suggest, if not the

---

[4] The Concurrence notes that the Stuckers raise a single-incident (failure to equip) theory of deliberate indifference under *Ouza* (which does not require evidence of a pattern) and concludes that such a claim requires the court to analyze whether *any* search warrant training occurred. Concurring Op. at 2. But that is not the only theory of deliberate indifference in this case, as the Concurrence recognizes. It is true that *Ouza* factually involved a lack of training, *see Ouza*, 969 F.3d at 286-88, and used a lack of training example, *id.* at 287. But in addressing the "fail[ure] to equip" claim, it did not establish that a total lack of training is required; instead, it referenced "the need for *more or different* training" to sustain a municipal liability claim. *Id.* at 287 (emphasis added) (quoting *Canton*, 489 U.S. at 390). What matters under *Ouza* is not a total lack of training, but rather the obviousness of the need for training and the likelihood that deficient training will "result in the violation of constitutional rights." *Id.* (quoting *Canton*, 489 U.S. at 390).

absence of a training program, "a deficient training 'program,' necessarily intended to apply over time to multiple employees," which can constitute inadequate training. *Bryan Cnty.*, 520 U.S. at 407. And Troutman's deposition testimony that he did not know what (if any) warrant training he had undergone, tied the unconstitutional warrant practices discussed in the Heintze Report to the LMPD's optional and rarely-attended warrant training. The evidence likewise goes to the second theory, whether LMPD has a custom of acquiescing to unconstitutional conduct, which requires showing a pattern of wrongdoing, constructive notice, deliberate indifference, and causation. *See Doe*, 103 F.3d at 508. The Heintze Report identifies several patterns of wrongdoing, and those patterns are bolstered by the inclusion of a complaint for similar behavior a year prior to the Stuckers's case.

The evidence also speaks to the issue of deliberate indifference, which is an element of both an inadequate training and acquiescence theory. "[A] plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act 'in response to repeated complaints of constitutional violations by its officers.'" *Ouza*, 969 F.3d at 287 (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). "Under this approach, a plaintiff must show that the defendant was aware of 'prior instances of unconstitutional conduct' such that it 'was clearly on notice that the training in this particular area was deficient and likely to cause injury' and yet 'ignored a history of abuse.'" *Id.* (quoting *Fischer v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). A "city's '"policy of inaction"' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (quoting *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)). In other words, deliberate indifference can be demonstrated through "[a] pattern of similar constitutional violations" showing that

"[p]olicymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.'" *Id.* at 62 (quoting *Bryan Cnty.*, 520 U.S. at 409). As the Supreme Court explained in *Canton*, an inadequate training case, "it may happen that in light of the duties assigned to specific officers the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390 & n.10.

Relying on the Supreme Court's decision in *Canton*, in *Shadrick v. Hopkins County*, we reversed a grant of summary judgment in favor of the municipality on a claim that the municipality was deliberately indifferent based on an inadequate training theory of *Monell* liability. 805 F.3d 724, 740-41 (6th Cir. 2015). There, nurses were inadequately trained to provide constitutionally sufficient care to inmates. As here, the nurses received initial training prior to the beginning of their work, but after licensure, they "denied receiving ongoing training about their medical responsibilities within the jail setting, and they disclosed that their superiors did not give feedback or regular evaluations to let them know whether they performed appropriately." *Id.* at 740. We held that such circumstances could amount to inadequate training. *Id.* Regarding deliberate indifference, moreover, we noted the testimony of the onsite-nursing manager at the detention center who "was not familiar with the SHP policies she was specifically designated to enforce," despite the knowledge that substandard care would likely result in bodily harm. *Id.* Because the severe risks associated with inadequate training under those circumstances were highly likely to result in harm, we held that a jury could find that the lack of adequate and updated training, paired with insufficient policies, amounted to deliberate indifference. *Id.* at 741.

As was the case in *Shadrick*, the inadequate training alleged here related to the failure to ensure that municipal employees receive necessary training on one of their job responsibilities—writing and executing warrants. Likewise, here, there is an "obvious need to train police officers who lack knowledge of [their] constitutional constraints;" a need illustrated by Troutman's admitted lack of knowledge about proper drafting and execution of search warrants. *Id.* at 742.

Deliberate indifference is also directly implicated by the Heintze Report's finding that LMPD has a "culture of acceptance" of impropriety, including by ignoring procedures in place to ensure constitutional compliance. R. 35-11, PageID 63. Before reaching the ultimate issue of deliberate indifference, however, we must address an evidentiary issue regarding pertinent information contained in the DOJ's 2023 Report on its investigation of the LMPD.

### b. 2023 DOJ Report

In addition to the evidence presented in the district court, the LMPD and the Stuckers reference DOJ reports in their briefing. (Appellee Br. at 31-32, ECF No. 17; Reply Br. at 7 n.1, ECF No. 19). In their Reply Brief, the Stuckers asked this court to take judicial notice of the 2023 DOJ Report finalized while their appeal was pending. (Reply Br. at 7 n.1, ECF No. 19). The LMPD moved to strike the Reply Brief's reference to the DOJ Report. We denied that motion for the reasons addressed below.

This court may take judicial notice of public records outside the record on appeal. *United States v. O'Dell*, 805 F.2d 637, 644 (6th Cir. 1986). And we "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). The DOJ Report may be judicially noticed under FRE 201(b)(2) because its sources "cannot reasonably be questioned." Under our authority to take judicial notice and our caselaw determining that such reports may be relevant to proving a policy or custom under a *Monell* claim, *see, e.g.*, *Simpkins v.*

*Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619 (6th Cir. Sept. 2, 2022), we take judicial notice of the Report and address it below.

The DOJ opened its investigation of the LMPD on April 26, 2021, following the March 13, 2020 shooting of Breonna Taylor. The DOJ's investigation included obtaining from the LMPD information and evidence dating back to 2016, relying on on-site tours and visits, interviews, extensive document review (including internal affairs and incident report filings, among others), and the review of "thousands of hours of body-worn camera footage." The DOJ Report was grounded in data that is relevant to this case.

One of the investigative focuses of the DOJ Report was "whether LMPD engages in unlawful search warrant practices," and the Report "sought to identify the root causes of any violations." DOJ Report at 9. Like the Heintze Report, the DOJ Report found that LMPD routinely failed to complete risk matrix assessments, record warrant executions, wear body cameras or turn body cameras on, and review warrant executions after-the-fact. *Id.* at 31. Relevant to this case, the DOJ Report explains: "As a matter of best practices, LMPD supervisors should—but do not— ensure that probable cause exists before LMPD seeks a search warrant. When probable cause exists, supervisors should—but do not—ensure that the warrant applications that officers draft set out the facts supporting probable cause." *Id.* at 27. In addition to these findings, the DOJ Report contained pages of incident examples and discussion of LMPD's practices. *See generally* DOJ Report at 1-3, 22-31.

The DOJ Report also includes a section titled "The inadequacies of LMPD's warrant applications are caused by poor supervision and oversight." DOJ Report at 27. In its Executive Summary, the Report states: "Failures of leadership and accountability have allowed unlawful conduct to continue unchecked. Even when city and police leaders announced solutions,

they failed to follow through. In LMPD, officer misconduct too often goes unnoticed and unaddressed. At times, LMPD leaders have endorsed and defended unlawful conduct." *Id*. at 1. Ultimately, the Report found that "LMPD engages in a pattern or practice of seeking search warrants in ways that deprive individuals of their rights under the Fourth Amendment." DOJ Report at 22.

In sum, the Stuckers have presented evidence raising questions about the LMPD's deliberate indifference through the Heintze Report, Troutman's testimony, and the data and specific facts contained in the 2023 DOJ Report. Because the district court did not have the Report when it previously rejected Plaintiffs' *Monell* claim, we vacate the district court's decision on this issue and remand for the district court to consider in the first instance whether the evidence, including the 2023 DOJ Report, creates a dispute of material fact as to LMPD's deliberate indifference and whether LMPD has met its burden to qualify for "judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

### III.   CONCLUSION

The Stuckers's claims against Troutman were properly dismissed. In its order granting summary judgment to LMPD, however, the district court erred by finding that no constitutional violation occurred: the LMPD's warrant did not establish a sufficient nexus to the Residence and contained stale information, and thus lacked probable cause. The Stuckers' Fourth Amendment rights were violated.

For a *Monell* claim to succeed, the Stuckers must prove both a constitutional violation *and* municipal responsibility. The district court has not yet had an opportunity to consider inadequate training or acquiescence in light of the 2023 DOJ Report and our finding of constitutional violations. We therefore vacate Part E of the district court's order and remand for the district court

to address the Stuckers' theories of municipal responsibility in light of this opinion and the record evidence, including the DOJ Report.

Accordingly, we **AFFIRM** the district court's order dismissing the claims against Troutman. We **REVERSE** the district court's order on the issue of whether a constitutional violation took place; **VACATE** Part E of the order; and **REMAND** the case for further proceedings consistent with this opinion.

**NALBANDIAN, Circuit Judge, concurring.** I agree with nearly all of the majority opinion, including the outcome that this case must be remanded. But I write separately to present another perspective on the issue of municipal responsibility in Part II.B.2. Specifically, I am concerned that the majority opinion could be read as implying that the *Monell* claim is already decided in Stucker's favor. But we should leave that for the district court on remand. The district court focused on the search warrant and probable cause question below. *See Stucker v. Louisville Metro Gov't*, No. 320CV00809GNSCHL, 2023 WL 2293355, at *2–9 (W.D. Ky. Feb. 28, 2023). And though it said that it would come out the same way on the *Monell* claim regardless of the probable-cause analysis, *see id.* at *9–12, our disagreement on probable cause merits remand. So even if we were not to consider the DOJ Report, of which I'm skeptical, this case should be sent back. At the very least, the district court needs to consider countervailing cases and evidence in the first instance. After all, a "*Monell* claim that survives summary judgment is exceedingly rare, and rightly so." *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 542 (6th Cir. 2018). So I write separately to raise some points worthy of the district court's careful consideration on remand.

First, as the majority acknowledges, both inadequate training and acquiescence *Monell* claims "require deliberate indifference." Maj. Op. at 19. Our caselaw recognizes two theories for showing deliberate indifference in the inadequate-training context. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020). The parties argue the issue this way too. *See* Appellant Br. at 18; Appellee Br. at 18–19. The most common option is for a plaintiff to show that the "municipality has failed to act in response to repeated complaints of constitutional violations by its officers." *Ouza*, 969 F.3d at 287 (internal quotation marks omitted); *Linden v. City of Southfield*, 75 F.4th 597, 605 (6th Cir. 2023) (quoting same language). But there is another option, and it is the one Stucker primarily pursues. *See* Appellant Br. at 18–22. In a "narrow range of

circumstances," a plaintiff can show what is called "single-incident liability," demonstrating that a municipality was deliberately indifferent by "failing to equip law enforcement officers with specific tools to handle recurring situations." *Ouza*, 969 F.3d at 287 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).[1] The distinctions between the two prove analytically important. To state the obvious, different theories require different showings: The repeated-complaints theory requires evidence of prior issues that give notice of constitutional violations, whereas the single-incident theory requires showing a lack of "any training." *Id.*

Stucker believes his case is like *Ouza*, where the police department failed to "provide any training" on the use of excessive force. And Stucker goes so far as to say "[a]t the very least, there is a genuine issue of material fact regarding whether Detective Troutman received search warrant training, which is actionable under *Ouza*." Reply Br. at 7. So to analyze this argument, the district court will need to assess whether Troutman received *any* search-warrant training.

The majority addresses LMPD's search-warrant training, *see* Maj. Op. at 20–21, but Appellees assert evidence of Troutman's other training:

> Detective Troutman testified, and his training transcript supports, that while he did not attend the 40-hour search warrant training, in October of 2016 he attended a 32-hour criminal investigation course in which search warrants were part of the training and officers had to draft search warrants as part of the course requirements. Detective Troutman received training on search warrants while at the LMPD

---

[1] For example, *Ouza* tells us that "if a municipality failed to provide any training to its officers on the use of deadly force, it would be liable to a person unconstitutionally killed by the police, given that city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons and the city has armed its officers with firearms, in part to allow them to accomplish this task." 969 F.3d at 287. There, "the need to train officers in the constitutional limitations on the use of deadly force" is "so obvious" that failing to "do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (citation omitted); *see also Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting same language).

Training Academy. He also attended Basic Narcotics Investigators School provided by the DEA which discussed search warrants in March of 2017.

Appellee Br. at 21. Stucker also acknowledges that LMPD's training division commander testified that LMPD provides basic training in the academy, training in the field while on the job, and elective training courses, in which the officer must take 40 hours per year of elective courses approved by Kentucky. *See* Appellant Br. at 19 (citing R.35-4, Grissom Dep., PageID 576).

Of course, we are in no position to make factual findings. But these factual claims will require serious consideration by the court below before the *Monell* claim may proceed. Because LMPD offers evidence of Troutman receiving some training that, if true, would defeat single-incident deliberate indifference, we must leave ultimate resolution of this question to the trial court.

The majority discusses what Troutman recalls from his training, *see* Maj. Op. at 21, but this evidence is of doubtful relevance. We have said that "failure to train is not measured by information retention." *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023). And putting memory aside, questioning how much—rather than any at all—training Troutman received is also insufficient for liability to attach. The Supreme Court admonished that it will not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *see also Harris*, 62 F.4th at 1038 (applying this principle). Indeed, such a "claim could be made about almost any encounter resulting in injury." *Harris*, 489 U.S. at 391. This makes sense because an "unsatisfactorily trained . . . officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91.

So to the extent the majority appears to suggest that LMPD can be liable for Troutman's personal recall and training deficiencies, it may conflict with on-point precedent. Moreover, holding LMPD liable for the continued mistakes of an individual officer veers awfully close to

*respondeat superior* liability. But *Monell* itself made clear that there is no *respondeat superior* liability under a § 1983 claim against a municipality. 436 U.S. at 691–93. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. I therefore think the evidence about Troutman's training is inconclusive for us to say much about the outcome of his *Monell* claim.

Turning to the other theory—repeated complaints—Stucker asserts that the LMPD "failed to act after notice of prior instances of unconstitutional conduct and deficient training" because LMPD "was sued by a family following the SWAT team raiding their residence on October 26, 2018 in military fashion due to a search warrant that lacked probable cause." Appellant Br. at 22. But one previous incident does not make a pattern. *See Brown*, 520 U.S. at 409 (explaining that a "pattern of injuries" is "ordinarily necessary" to demonstrate deliberate indifference); *see also Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005) (explaining that the repeated-complaints approach "typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures").

Even if Stucker only points to one past instance, perhaps the Heintze and DOJ Reports can provide more evidence.[2] We should realize that the timing may not line up. The incident with

---

[2] I've got a quibble with using the DOJ Report on appeal. The majority concludes that a court may take judicial notice of the DOJ Report, which was completed while this case was pending on appeal and suggests that the Report may also be relevant evidence based on our decision in *Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619 (6th Cir. Sept. 2, 2022). In that case, the court determined that a similar DOJ report was not inadmissible hearsay because it was a public record. *Id.* at *10–11 (citing Fed. R. Evid. 803(8)). And the court rejected an argument that a provision disclaiming the evidentiary value of the report rendered it inadmissible. *Id.* at *9. But that still leaves a gap because the *Simpkins* court did not discuss how the document would be

Stucker occurred in 2019. But the Heintze Report was not released until 2021, and the DOJ Report in 2023. So it's an open question whether the reports and the events detailed within them—if we accept the factual contents of the DOJ Report—demonstrate that LMPD had notice of, and was deliberately indifferent to, repeated violations leading up to 2019. Compare this case to *Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619 (6th Cir. Sept. 2, 2022). There, the DOJ "communicated its preliminary assessment to" the prison "in 2016," putting them on notice of excessive force practices that persisted through 2018, when the incident at issue occurred. *Id.* at *14. We do not have any evidence of something similar here.

Plus, if the district court lets in the contents of the DOJ Report, there is evidence in the Heintze and DOJ Reports that cuts the other way. The Heintze Report found that before March 2020, "the LMPD modified its policies to improve practices for drafting and serving search

---

authenticated and admitted into the record as evidence. So whether and how the DOJ Report comes in below is a matter for the district court to settle.

This will perhaps not be an issue below given the nature of the DOJ Report. The Report may be self-authenticating, *see* Fed. R. Evid. 902, or maybe a witness could authenticate it and otherwise testify about it at trial, *see* Fed. R. Evid. 901, or perhaps Defendants will not object to its admissibility. These are questions for the district court.

But it's an issue that limits our consideration now. After all, the rule on judicial notice cabins a court's discretion to taking judicial notice of a "fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b). And the fact that the DOJ Report was prepared and filed is not the same as the contents of the Report. Thus, we have drawn a distinction between taking judicial notice of the fact of the filing of such a report, which is permitted, and taking judicial notice of the facts contained in the report, which is not permitted. *See Abu-Joudeh v. Schneider*, 954 F.3d 842, 848 (6th Cir. 2020) ("[C]ourts do not take judicial notice of documents[;] they take judicial notice of facts."). Indeed, if a party asks us to take judicial notice, not of the existence of a report, but matters asserted in the report, we would typically treat that request as a motion to supplement the record. *See Abu-Joudeh*, 954 F.3d at 848; *United States v. Smith*, No. 23-5519, 2024 WL 1007115, at *8 (6th Cir. Mar. 8, 2024).

Regardless, I think remand is appropriate here apart from consideration of the DOJ Report. And so the question whether and what evidentiary value the Report has will be decided below, though I've explained some of my views on that question elsewhere in this concurrence.

warrants." Heintze Report at PageID 636. And for all the flaws the DOJ Report points out, it also reports that the LMPD has "made a number of changes," "started implementing" the recommendations of the Heintze Report, and did not wait "for the outcome of this investigation to make improvements" since 2020. DOJ 2023 Report at 2, 8, 81; *see also id.* at 80 (describing LMPD's establishment of "new" accountability measures). Making changes and implementing new policies might show that the LMPD was not ignoring problems, but was instead trying to fix them, even if unsuccessfully. So questions remain about deliberate indifference under both reports.

Second, the majority treats Stucker's inadequate training and acquiescence claims the same, which is justified to the extent that the deliberate indifference analysis overlaps. But there may be reason to analyze the acquiescence claim separately. For starters, Stucker doesn't even try to state a legal test for this claim in his brief. *See* Appellant Br. at 23. Stucker simply says, "Hilliard Heintze found a 'culture of acceptance' within the LMPD in which 'supervisors seldom queried officers regarding the underlying facts and circumstances necessary to demonstrate probable cause.'" *Id.* (quoting Heintze Report at PageID 637). Stucker also points to the DOJ 2023 Report as evidence of acquiescence to constitutional violations because that report stated that there was inadequate internal supervision to prevent systemic violations in the LMPD. *See* Reply Br. at 9–10. Given that we have found arguments "adverted to in a perfunctory manner" to be forfeited, *see, e.g.*, *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022), I am worried about reading too much into Stucker's argument. But if this is all we have from Stucker, then we should remember that "[m]ere blanket assertions that [Louisville] 'tolerated' or 'condoned' officer misconduct aren't enough." *Howse v. Hodous*, 953 F.3d 402, 410 (6th Cir. 2020). In *Howse*, even after the plaintiff proffered a DOJ memo "as evidence of a pattern of

unlawful activity," the court concluded that "even assuming that's enough (and we're not sure it is), Howse hasn't shown that Cleveland approved of that unlawful activity *or* that any such approval caused Howse to suffer a constitutional injury." *Id.*

In sum, the district court has ample room to consider the evidence in the first instance without thinking our panel has already prejudged the *Monell* issue.